**COMMISSIONER OF INTERNAL REVENUE v. TRUSTEES OF LUMBER INV. ASS'N.***

**TRUSTEES OF LUMBER INV. ASS'N v. COMMISSIONER OF INTERNAL REVENUE.**

**RANDOLPH LUMBER CO. v. SAME.**

Nos. 6435–6437.

Circuit Court of Appeals, Seventh Circuit.

Sept. 26, 1938.

Rehearing Denied Dec. 14, 1938.

*Writ of certiorari denied 59 S.Ct. 587, 83 L.Ed. —.

James W. Morris, Asst. Atty. Gen., Sewall Key and S. Dee Hanson, Sp. Assts. to the Atty. Gen.

Ellis N. Slack, Sp. Asst. to Atty. Gen., for Commissioner.

William S. Bennet, of New York City, for taxpayers.

Before MAJOR and TREANOR, Circuit Judges, and LINDLEY, District Judge.

TREANOR, Circuit Judge.

These cases are here on petitions for review of decisions of the United States Board of Tax Appeals. The decisions were rendered in proceedings for the redetermination of income tax deficiencies. Causes No. 6435 and 6436 were docketed as one cause by the United States Board of Tax Appeals, the consolidated causes presenting two issues. One issue was decided in favor of the taxpayer, and the Commissioner petitions for review thereof in our cause No. 6435. The other issue was decided in favor of the Commissioner and the taxpayer petitions for review in our cause No. 6436. Cause No. 6437 in this court is here on petition of the taxpayer for a review of an adverse decision in a separately docketed cause before the Board. The causes before the Board of Tax Appeals were consolidated for hearing and the appeals to this court are likewise consolidated. Causes No. 6436 and 6437 present the same question of law and will be discussed together.

Cause No. 6435.

In this cause the petitioner is the Commissioner of Internal Revenue and the respondent-taxpayer is Trustees of Lumber Investment Association which holds stock in various corporations. By reason of its large holdings in other corporations it has become a "parent" corporation which operates subsidiary corporations; and in numerous instances the parent and subsidiaries have qualified as "affiliated corporations" under the Revenue Acts of 1924 and 1926.[1] And the decision in cause No. 6435 depends upon whether three corporations, including

---

[1] Chapter 27, 44 Stat. 9, 46, Sec. 240, Revenue Act of 1926; Revenue Act 1924, § 240, 43 Stat. 288.

Trustees of Lumber Investment·Association,[2] taxpayer-respondent, were affiliated during the years 1924, 1925 and the first seven months of 1926. And the answer to the foregoing question depends upon the ownership of 2,000 shares of one of the subsidiary corporations.

The 2,000 shares, the ownership of which is in question, were part of an issue of 34,500 shares of stock of Park Falls Lumber Company. The taxpayer owned and held 32,250 of these shares during the period herein involved. If the taxpayer owned the 2,000 shares, as it claims, then it owned more than 95% of the stock of Park Falls Lumber Company. It also appears from the facts that the taxpayer-respondent and the Park Falls Lumber Company owned all of the stock of the second subsidiary, the Edward Hines Farm Land Company; and it is assumed by both petitioner and respondent that if respondent held more than 95% of the stock of Park Falls Lumber Company "the same interests" would then have the ownership of more than 95% of the stock of Edward Hines Farm Land Company. The issue as to the ownership of 2000 shares arises from the following facts:

, On January 1, 1920, a written instrument was executed by Park Falls Lumber Company[3] and one W. B. Clubine. By the terms of the instrument Clubine agreed to enter Park Falls Lumber Company employ as general manager of its business for a period of five years; and Park Falls agreed to employ him as its general manager for the term at a salary of $12,000 a year. The instrument contained further recitals as follows: "As further consideration of this agreement and because of the particular qualifications of (Clubine) * * and as an inducement to * * * (Clubine) * * * to render efficient service and to continue such employment for the full five years, the Trustees of Lumber Investment Association agrees to transfer to (Clubine) as of this date, $200,000 in par value of the capital stock of Park Falls.Company, in consideration whereof (Clubine) agrees to and does give to said Trustees of Lumber Investment Association his promissory note of even date for the sum of $200,000 payable on or be-

fore five years from date with interest at the rate of 5% per annum." The instrument further provided that the·certificate or certificates of stock should state that the stock was issued "conditioned upon and subject to the terms of the instrument of contract dated January 1, 1920." It was further agreed that the certificates of stock should be indorsed in blank by Clubine and should remain in the custody of the Trustees of Lumber Investment Association, taxpayer-respondent, "as collateral security for the note hereinbefore described." All dividends declared on the stock were to be applied first.to payment of interest on the note, and the remainder if any was to be applied on the principal. It was agreed further that in case Clubine's employment should terminate for any reason, including death, before five years, or before the payment of the note by the application of the dividends thereto, then "the party of the second part, or his estate, if he shall have died, shall have the right to elect either (1) to purchase the said stock or (2) to sell it to the Trustees of the Lumber Investment Association." If the election should be to purchase, the purchase price was to be the unpaid balance of the note; and if the election should be to sell, the trustees were to pay Clubine or his estate the excess of the book value of the stock over the unpaid balance of the note. But in case the book value of the stock should be less than the unpaid balance of the note, the note and all· mutual claims concerning the stock were to be cancelled; and neither Clubine nor his estate was to be held for any deficiency.

The agreement also provided for its extension for a further period of five years if Clubine, at the end of the first five year period, had not then fully paid for the stock according to the method prescribed in the agreement and if Clubine continued in the employment of the company for a further term of five years.

On the same date that the written instrument of contract was executed by Park Falls Company and Clubine, Trustees of Lumber·Investment Association adopted and approved same by a written statement which was endorsed on the written instrument.

[2] The other two are Edward Hines Farm Land Company and the Edward Hines Hardwood and Hemlock Company. The latter was formerly named Park Falls Lumber Company and under that name engaged in the transactions which are involved in this cause.

[3] The name Park Falls Lumber Company was changed to Edward Hines Hardwood and Hemlock Co. in 1924.

In accordance with the terms of the foregoing three party agreement Trustees of Lumber Investment Association issued to Clubine certificate No. 10 for 2,000 shares of stock of the Park Falls Lumber Company and obtained Clubine's receipt therefor. The certificate of stock carried a written notation that it was issued subject to the terms of the aforesaid contract. Later Clubine endorsed the certificate in blank and delivered it to the trustees as collateral security for the payment of his note.[4]

After execution of his note and receipt of certificate No. 10 for the shares of stock Clubine, at the request of a representative of Trustees of Lumber Investment Association, gave his check payable to the Association to cover United States Revenue Stamps of $40, which were required for the stock transfer.

On January 2, 1920, there was entered a credit of $200,000 on the books of Trustees of Lumber Investment Association. The credit was designated as "W. B. Clubine folio, J. 1;" the "J. 1" being a cross reference to a journal entry which read in part "a/c Sale 200 shares, stock to W. B. Clubine." Also the "Walter B. Clubine" account on the books of Lumber Investment Association was charged with interest on account of Clubine's note.

On July 17, 1924, a second written agreement was executed between the Park Falls Lumber Company and Clubine which continued the original agreement for five years with some modification of its terms. Under the modified agreement, in case of Clubine's death or his incapacity by accident or sickness, he, or his estate, was given the additional options first of having the Trustees of Lumber Investment Association hold the stock until such time as the dividends should pay the purchase price, or second, of selling the stock to outside parties subject to payment of any unpaid balance thereon at the time of such transfer. Further the price at which Clubine "purchased the said stock" was revised as of January 1, 1920, from $100 to $80 per share and interest was recomputed from January 1, 1920 at 5% based on the price so revised. In making the necessary adjustments a payment of $10,000 for interest was credited to Clubine's account and a $40,000 credit was indorsed on his note.

During the period between January 1, 1920, and August 2, 1926, no cash payments were made by Clubine or by anyone on his behalf on account of either the principal of the $200,000 note or interest thereon. Nor during that period were there any dividends declared on the 2,000 shares of stock, nor were there any credits applied on the note except the $40,000 adjustment credit of July 7, 1924.

From January 1, 1920, to August 2, 1926, there were three formal stockholders meetings and Clubine voted in person as a stockholder at two of the meetings and by proxy at the other.

In the affiliated questionnaires that were filed with the Commissioner of Internal Revenue for the years 1921, 1923, 1924, Trustees of Lumber Investment Association was reported as the owner of only 32,250 of the 34,500 outstanding shares of the capital stock of the Park Falls Lumber Company; and the remaining 2,250 shares were reported in the 1921 questionnaire as being owned by "minority interests," and in the 1923 and 1924 questionnaire as being owned as follows: Walter B. Clubine, 2,000 shares. Gertrude W. Bennett, 250 shares.

---

4 (Clubine's note for $200,000, together with notations thereon.)

"Park Falls, Wisconsin, January 1, 1920.

"On or before five (5) years, I promise to pay to the order of Trustees of Lumber Investment Association Two Hundred Thousand and no/100 Dollars, at the Continental and Commercial Bank, for value received, with interest at the rate of five (5) per cent per annum after date. And I have deposited with Trustees of Lumber Investment Association as collateral security for the payment hereof, Certificate No. 10 for 2,000 shares of the capital stock of the Park Falls Lumber Co. This Note Is Subject to That Certain Contract Executed Under Even Date Between the Trustees of Lumber Investment Association and Myself.
"(Signed) W. B. Clubine.
"Amount of note revised by Contract July 17th, 1924. (See Contract.)
"W. S. B.
"Note cancelled August 2nd, 1926, in pursuance of Contracts of January 1st, 1920, and July 17th, 1924.
"Edward Hines Hardwood and
Hemlock Company,
"By: (Signed) Edward Hines,
President.
"Trustees of Lumber Investment
Association,
"By: (Signed) Edward Hines,
President."

No more questionnaires were filed until June 18, 1928, when one was filed by Park Falls Lumber Company (name then being Edward Hines Hardwood and Hemlock Company) advising of change in the ownership of its corporate stock as a result of the acquisition by Trustees of Lumber Investment Association of 2,000 shares in 1926 from Walter B. Clubine.

In the stipulation of facts is the recital that in 1920, when Trustees of Lumber Investment Association accrued on its books $10,000 as interest due from Walter B. Clubine on his note of $200,000, it was then thought that said note and accrued interest would be paid, and it was not determined until 1926 that the note (which on July 17, 1924, had been reduced from $200,000 to $160,000) and all accrued interest on said note would not be paid.

In January, 1926, Clubine resigned his position with Park Falls Lumber Company effective as of February 1, 1926. At a special meeting of the Board of Directors of the Park Falls Lumber Company the president's action in accepting the resignation of Mr. Clubine was "ratified, approved, and confirmed" and the President was authorized to endorse Mr. Clubine's contract: "Contract cancelled as of February 1, 1926, and stock released."

On August 2, 1926, stock certificate No. 10, and the $200,000 note were cancelled and a new certificate No. 16 for 2,000 shares of the capital stock was issued to the "Trustees of Lumber Investment Association."

The foregoing are the facts which are especially significant for the determination of the ownership of the stock. The Board of Tax Appeals held that Trustees of Lumber Investment Association had continued to be the owner of the stock and that Clubine had not been at any time the owner of such stock.

The original agreement contains provisions which are understandable only upon the assumption that the parties contemplated a sale and purchase of the stock as of the date of the execution of the agreement. It was expressly stated that the Association, for named consideration, agreed to transfer the stock to Clubine "as of this date"; that the Association would hold the stock as "collateral security" for Clubine's note, and (if Clubine should elect to sell to the Association in accordance with the terms of the agreement) would pay on a designated basis

"and *become* the *owner* of the said stock." (Our Italics.) And in consideration of the Association's agreement to transfer the stock "as of this date" Clubine "agrees to and does give * * * his promissory note of even date * * *" The stock certificate was to have written upon it "this stock is issued conditional upon and subject to the terms * * *. (of the agreement) * * *"; and the "certificate or certificates" were to be endorsed in blank by Clubine and to remain in the *custody* of the Association as collateral security for payment of the note.

The subsequent conduct of the parties in relation to the stock transaction indicates that the parties intended a transfer of ownership from Trustees Association to Clubine, and that such transfer had occurred. A certificate of stock ownership was issued to Clubine and he receipted therefor. Clubine's note was executed and both the certificate of stock, endorsed in blank, and the note were delivered to Trustees of Lumber Investment Association. The note contained a recital that Clubine had deposited with the Trustees of Lumber Investment Association as collateral security for the payment of the note "certificate No. 10 for 2000 shares of the capital stock of the Park Falls Lumber Company." Trustees of Lumber Investment Association treated the $200,000 note as an asset of the Association and charged Clubine's account with interest on account of his note; and the interest which was charged to Clubine was included in the gross income of the Association for the respective years in which it accrued. Clubine voted the 2,000 shares of stock at regular meetings of the Association either in person or by proxy, thereby exercising a characteristic power of stock ownership. The affiliated questionnaires disclosed ownership of the stock in Clubine in 1923 and 1924 and an acquisition of the same in 1926 by Trustees Investment Association from Clubine.

When we examine the obligations assumed by the parties to the contract we find all the necessary elements for a valid and binding contract of sale of stock as well as an employment contract. The manner of performing the contractual obligations is subject to some extent to conditions and "options"; but we find no provision which destroys the legal obligation of the contract. Clubine promised to enter into the employ of the Association as

general manager for a period of five years and to devote all of his skill, energy and time to the business; and the Association agreed to employ him as its general manager for such term. The Association agreed to pay a fixed sum of $12,000 a year for the five year period and as a "further condition" and because of the "particular qualifications" of Clubine, and as an inducement to Clubine to render efficient service and continue his employment for the full five years the Association agreed to transfer to Clubine, as of the date of the agreement, $200,000 in par value of the capital stock of Park Falls Lumber Company. And in consideration of this "further condition" Clubine agreed to give, and did give, to the Association his promissory note of $200,000 payable on or before five years from date with interest at the rate of 5% per annum.

The foregoing promises are clear and definite and, as already noted, the Trustees Association and Clubine did perform all the acts which ordinarily transfer legal ownership of stock from an issuing corporation to a purchasing stockholder.

In its memorandum opinion the Board emphasizes the fact that Clubine's promise to pay the note was not unconditional and states that if the note "had been intended to be unconditionally payable * * * then clearly it would be proper to hold that the contract was a contract of sale and that title to the 2,000 shares of stock in question passed immediately to Clubine and was merely being held by the Trustees of Lumber Investment Association as collateral security for the payment of Clubine's note." But granting that the promise to pay the note was conditional, it does not follow that the intention of the parties was that transfer of ownership should be conditional upon the payment of the note. It is clear that Clubine was under no legal obligation to pay principal or interest of the note by *cash* payments *prior* to the expiration of the employment period. No doubt the parties expected dividends on the stock to contribute substantially to the payment of the note; but there is no agreement that required payments of principal and interest to be made solely from dividends. And even if there had been, that would not have prevented transfer of ownership of the stock as of the date of the contract. Such a conclusion is a necessary

implication of the discussion in the opinion of this court in Behles v. Commissioner.[5] In that case it was expressly agreed that a condition of the purchase of 25 shares of stock was that the price be paid wholly from dividends; and that the purchaser assumed no other responsibility or obligation for the payment of the purchase price. In the Behles Case, as in the instant case, the stock transfer was a part of an employment arrangement, and it was agreed that if the purchaser should cease to be employed by the vendor that the vendor should have the option to purchase the shares of stock at its then book value, less any sum that might be due on the purchase price. This court in its opinion in the Behles Case treated the conditional payment restriction as a device of the vendor, used to encourage the purchaser to remain in the vendor's employ; and the court was of the opinion that the conditional promise of payment and the restrictive provisions did not prevent the transfer of ownership as of the time of the agreement, although payment was not completed by application of dividends until a year later,—and might have been completed much later, or not at all.

In the instant case the note includes a recital that "this note is subject" to the contract between Trustees Association and Clubine. And while the contract provides methods of discharging Clubine's obligation on the note other than by cash payment, yet there is no agreement that he is free to perform or not perform his obligation on the note. By the terms of the contract, it was only in case of Clubine's death, or discontinuance of his employment for other reasons, that there became available "options" to discharge the obligation of the note by means other than application of dividends or cash payments. If Clubine had continued in the employment of the Association beyond the term of the contract, as extended, the Association could have enforced payment of the note. Except for the recital "subject to the contract" etc., the note carried Clubine's unconditional promise to pay the principal sum and interest on or before five years from January 1, 1920. And none of the conditions or options relieved Clubine from his obligations under the agreement and the note except in accordance with terms and upon the happening of contingencies,

---

[5] 7 Cir., 87 F.2d 228.

which the parties properly could utilize as a legal basis for modification of, or release from, legal liability.

The original agreement provided that in case of termination of Clubine's employment during the five years' term, or in case of his death prior to the termination of the contract, or prior to the payment of the note by the application of dividends, Clubine, or his estate, had the "right to elect either, (1) to purchase the said stock, or, (2) to sell it to Trustees of Lumber Investment Association," the sale price to be a sum equal to the book value of the stock less any unpaid balance of principal and interest. Also, the "purchase" transaction by Clubine or his estate was to consist of paying the balance and receiving "the said stock and the cancelled note." Consequently, the foregoing "right to elect" did not destroy Clubine's legal obligation to pay the note. Performance of either alternative would constitute payment of the note.

Nor was Clubine's promise to pay the note nullified by the Association's promise to cancel the note under named conditions. The contingencies were death of Clubine or termination of his employment and that the book value of the stock be less than the amount due on the note. But to take advantage of the Association's promise to cancel the note Clubine, or his estate, was required to cancel all claims upon the Association "concerning said stock." Clubine or his estate, would lose all payments which might be made prior to the happening of the contingencies and the Association would get back the stock free of any claim. Also the Association would have had the benefit of the employment agreement and of Clubine's services up to the date of termination of employment; and it is stated in the agreement of January 1, 1920, that Trustees Association considered the long term employment contract and Clubine's services thereunder of greater value to the Association than the salary which was to be paid Clubine. The contract recited that the agreement to transfer the stock as of January 1, 1920, was "a further consideration" of the employment agreement and "an inducement to Clubine to render efficient service and to continue such employment for five years."

The various options or elections do not destroy the legal obligations of Clubine under the employment agreement and note, but only furnish alternative methods of discharging the obligations upon the happening of named contingencies.

We find nothing in the terms of the agreement covering the deposit of the certificate of stock for collateral security to qualify Clubine's legal title to the 2,000 shares of stock. The agreement of January 1, 1920, provided that the certificate should be indorsed in blank by Clubine and remain "in the custody of the Trustees of Lumber Investment Association as collateral security for the note hereinbefore described." Clubine indorsed the certificate in blank and delivered it to the Trustees in accordance with the foregoing terms. Clubine's note contained a recital that "I have deposited with the Trustees of Lumber Investment Association as collateral security for the payment hereof certificate No. 10 for 2,000 shares of the capital stock of the Park Falls Lumber Company." There is no suggestion of an intention to recognize any interest of the Association in the stock except such pledge interest as was created by the deposit of the certificate, this pledge interest being recognized solely as collateral security for the payment of the note. The certificate was to remain "in the custody" of the Association "as collateral security." No power is conferred upon the Association to deal with the stock as an owner. The only powers which it could exercise, under the agreement, are the powers necessarily implied to protect its pledge interest.

The agreement, as modified on July 17, 1924, gave to Clubine, or his estate, the privilege of having the note paid by application of dividends in case of death or incapacity of Clubine by accident or sickness. And in that event the Association would continue to hold the "said stock" until such time as the dividends would pay "the purchase price thereof, including both principal and interest * * *." The modifying terms do not purport to change or qualify the ownership interest in the stock or to add any powers to the Association as pledgee of the stock certificate.

Some of the language in the agreement is ambiguous, and if it were considered apart from the context it would be inconsistent with an intent to transfer ownership of stock prior to the payment of the note, or to its discharge in accordance with the provisions of the agreement. For example paragraph five of the original agreement provides that in named contingencies Clubine, or his estate, should

have the right "to elect either (1) to purchase the said stock, or (2) to sell it to the Trustees of Lumber Investment Association." It is clear that Clubine could not "purchase the said stock" if he had become the owner of the stock, and it is equally clear that he could not "sell it" if he had not become the owner of it. Both "purchase" and "sell" cannot be given their usual legal meaning. But the methods which are provided for the purpose of making effective the election "to purchase" or "to sell" indicate that "to sell" was used in its technical sense and that "to purchase" was not so used. If the election was "to purchase" the method was simply that the one electing "shall pay to the parties of the first part the sum so found to be still due upon the said note, and shall receive the said stock and the cancelled note." On the other hand if the election was to have the trustees of the Association purchase the stock the trustees would pay to the parties so electing the "book value of the stock, less the amount due on the note as so fixed, and become the owners of the said stock * * *." Since we are confronted with the necessity of reconciling the phrases "to purchase" and "to sell" we cannot disregard the significance of the words "become the owners of said stock." In contrast to this Clubine, or his estate, in order "to purchase" was required only to pay the amount still owing on the note and was then entitled to "receive the said stock and the cancelled note." There is no apt word to suggest that the one electing "to purchase" would become the owner of the stock through the act of receiving the stock and the cancelled note. Since we know by specific provisions of the agreement that the association was holding the stock certificate as collateral security for the payment of the note, the words "shall receive the said stock and the cancelled note" normally would mean that the Association would deliver the stock certificate and the cancelled note upon receipt of the amount due, which is exactly what ordinarily happens when any property is being held as collateral security for the payment of a note and such note is paid.

It seems that the only reasonable way of reconciling "to purchase" and "to sell" is to construe the election "to purchase" to mean election to pay the balance due on the note and, thereby, acquire full enjoyment of all the incidents of ownership of the stock, which Clubine did not have, and could not have, as long as the Association had custody of the stock certificate as collateral security for the payment of the note.

To give to "to purchase" the meaning "to acquire ownership of" would necessitate disregarding the completely neutralizing influence of "to sell", the significance of the "collateral security" arrangement and other provisions of the agreement. The Trustees Association could not in any understandable factual or legal sense hold its own property as collateral security for the debt of Clubine.

Respondent urges that "at all times trustees had exactly the kind of control of the Clubine stock as is required by the interpretation of Section 240 (b) of the Revenue Act of 1924, 43 Stat. 288, contained in Handy & Harman v. Commissioner, 284 U.S. 136, 52 S.Ct. 51, 76 L.Ed. 207, and Olds & Whipple v. Commissioner, 2 Cir.., 75 F.2d 272;" that the trustees, at any time, could have surrendered certificate No. 10 to themselves and could have issued a new certificate to themselves in their own name; that their control at all times was complete. In the Handy & Harman v. Commissioner Case, supra, affiliation was claimed under Section 240 of the Revenue Act of 1918, 40 Stat. 1081, which authorized the affiliation if substantially all of the stock of two or more corporations was owned or controlled by the same interests. It was urged on behalf of the petitioner in that case that "when two or more corporations are operating as a business and economic unit, actual control of the stock of the minority is sufficient whether based upon legally enforcable means." The Supreme Court decided otherwise, and stated its conclusion as follows [page 53]: "It would require very plain language to show that Congress intended to permit consolidated returns to depend on a basis so indefinite and uncertain as control of stock without title, beneficial ownership or legal means to enforce it. Control resting solely on acquiescence, the exigencies of business or other considerations having no binding force is not sufficient to satisfy the statute."

The words "or control" of Section 240 of the Act of 1918 have been eliminated and under the present statute *ownership* of the required percentage of stock is the exclusive requirement for affiliation.

Respondent's suggestion that the Trustees were free at any time to cancel cer-

tificate No. 10 and issue a new certificate to themselves in their own name presupposes ownership by them and is not consistent with the agreement to hold certificate No. 10 as collateral security for the payment of the note. The Trustees had no such legal right until default on the pledged agreement had occurred. It appears from the record that the Trustees of the Association treated Clubine's failure to take up his outstanding note by August 1, 1926, as a default; and on August 2, 1926, the Association cancelled certificate No. 10 and Clubine's note and issued to the Trustees of the Association certificate No. 16 for 2,000 shares of the corporate stock of the Edward Hines Hardwood and Hemlock Company formerly the Park Falls Lumber Company. Granting that the Association had the legal power to extinguish Clubine's ownership under certificate No. 10 and to revest the legal ownership in the Association, such power was the legal consequence of the pledge transaction and exercisable only upon the default of Clubine. But we find no basis for holding that any such power rested upon continued ownership of the stock by Trustees Association. Under appropriate terms of an agreement or grant title to property can revest in an original grantor on the happening of conditions subsequent.

Respondent urges strongly the authority of Alger-Sullivan Lumber Co. v. Commissioner of Internal Revenue,[6] Moore v. McGrawl,[7] and Indianapolis Glove Company v. United States.[8]

In Alger-Sullivan Lumber Company v. Commissioner of Internal Revenue, supra, the contract respecting the transfer of stock contained the recital that the company "has this day agreed to set apart and hold in its Treasury Fifty (50) shares of [its] capital stock * * * and sell the same to the employee at and for the sum of One Hundred & 00/100 ($100.00) Dollars per share, subject to the following conditions. * * *" By the terms of the contract there was no obligation to issue stock to the employee until dividends had fully paid the purchase price; and the dividends were not treated as dividends upon the stock of the employee.

In Moore v. McGrawl, supra, there was a question of affiliation for the purpose of making a consolidated return and the material issue was whether more than 5%

of the company's stock had been transferred by virtue of an agreement with employees. The court considered the Alger-Sullivan Case as authority and held that title did not pass by the agreement. The only provisions of the transfer agreement which are considered material by the court are contained in the following statement in the court's opinion [page 594]: "The agreement * * * recited the sale of stock at par and the giving of a note therefor * * * while the note expressed an unconditional obligation to pay, nevertheless the real agreement was that the note should be paid only out of dividends accruing upon the stock. The contract further provided that *it was at the option of the employee whether he would pay for the stock;* the option to last so long as he should continue to remain an employee." (Our italics.)

It is clear that the court's decision rested upon the ground of lack of mutuality resulting from the absence of any consideration moving from the employee either in the form of an act or services or any promise, intended to be binding, to pay the price of the shares of stock in the form of dividends or cash payments by the employee. We think the instant case is distinguishable from the foregoing cases on its facts. There was adequate consideration given by Clubine, and his release from the obligation to pay the note either by application of dividends or by cash payments was not at the free choice of Clubine but rested upon terms and conditions which necessarily involved mutual advantages or detriments substantial enough to constitute a legal basis of release.

In the Indianapolis Glove Company Case, supra, decided by this court, the taxpayer corporation was claiming a deduction in the amount of the value of certain stock which it had transferred to employees; the claim being that such transfer constituted additional compensation for employees. In June, 1925, the taxpayer had offered 850 shares to employees for an aggregate sum of $85,000. Demand notes were executed by the employees which were to be paid by dividends declared on the stock. The stock was retained by the company "as collateral security for the payment of the notes." [page 817.] Between 1925 and 1929 $31,450 in dividends

---

6 5 Cir., 57 F.2d 3.
7 5 Cir., 63 F.2d 593.

8 7 Cir., 96 F.2d 816.

was declared on such stock. This amount was not applied on the notes but was paid to and retained by the employees. In 1929 the company's stock had increased in value and the company by appropriate action changed its common stock from $100 par value to no par value and authorized the issuance of 4 no par value shares for each of the former par value shares; the original shares thus being converted into 3,400 shares. The old notes were returned to the employees who gave new notes, aggregating $85,000, and at the same time 1,700 shares, half of the newly created 3,400 no par value shares, were delivered to the employees. The taxpayer contended that the transfer of this block of 1,700 shares constituted a payment of additional compensation and was not a sale of stock to employees. The opinion of this court sums up the question in the statement that "such determination revolves largely around the question as to whether the transaction between appellee and its employees in 1925 constituted an absolute sale of the stock or whether it was merely an arrangement between the parties by which the employees were to receive an additional compensation for services rendered by them in succeeding years when and if certain things occurred."

The court pointed out that the problem was to discover what the parties had "in their minds at that time"; and pointed out that the theory of a sale as of 1925 was supported by the fact that the certificates were issued in the name of the employees and the notes accepted for the agreed value of the stock. But the court (in calling attention to facts pointing to the contrary) states that although "the employees gave their demand notes, valid upon their face, yet they were told that such notes would not be collected and that they were to be paid entirely from stock dividends when such dividends were sufficient for such purpose. * * * that for five years [the company] made no effort to, and judged by its actions, never had any intention of collecting said notes, * * * that the employees made no payment."

There was also the significant fact that dividends were declared during the period between 1925 and 1929 which were paid to the employees and not applied as payments on the notes. In distinguishing another case this court remarked that it was not controlling in the case before it "where the makers of the notes paid nothing and, in fact, were relieved of all obligation to pay."

We think the foregoing case is not controlling in the instant case in which there are material facts, not present in the former case, which indicate that the intention of the parties at the time of the making of the original agreement respecting the stock transfer was to effect a presently completed sale. And especially there is absent in the Indianapolis Glove Company Case the many subsequent acts of the parties which in the instant case are inconsistent, factually and legally with a continuation of ownership in Trustees Association. In the Glove Company Case the subsequent facts tend to show an absence of understanding that there had been a completed sale, and the district court so found.

We conclude that the ownership of the 2,000 shares of stock in question was vested in Clubine as of January 1, 1920, and that he continued to be, and was the owner of the stock during the years 1924 and 1925 and the period January 1 to July 31, 1926. And on the basis of the foregoing it follows that Trustees of Lumber Investment Association owned less than 95% of the voting stock of Edward Hines Hardwood and Hemlock Company (originally Park Falls Lumber Company) during the years 1924 and 1925 and the period January 1 to July 31, 1926. We hold that the Edward Hines Hardwood and Hemlock Company and the Edward Hines Farm Land Company were not affiliated with Trustees of Lumber Investment Association for the aforesaid period within the meaning of Section 240 of the Revenue Act of 1924 and 1926.

The decision of the United States Board of Tax Appeals in cause No. 6435 is reversed.

Causes No. 6436 and 6437.

These two causes as presented to this court by parties require the determination of a single question, and this question may be stated as follows: May the net losses of affiliated corporations for one tax year be used as a consolidated net loss of the affiliated group to be carried forward as a unit and applied as a deduction from the consolidated net income of the affiliated group for the succeeding tax year? The taxpayer in cause No. 6436, Trustees of Lumber Investment Association contends that the consolidated net loss of the Trustees Association and affiliated organizations for the year 1925 should be carried

forward as a unit and deducted from the consolidated net income of the Trustees Association and affiliated corporations for the year 1926 and 1927; and in cause No. 6437 the taxpayer, Randolph Lumber Company (formerly Edward Hines Lumber Company) urges that the net loss of the Randolph Lumber Company and affiliated organizations for the years 1921 and 1922 should be carried forward as a unit net loss and deducted from the consolidated net income for the affiliated group for the year 1923. The taxpayer-petitioners rely upon the following propositions: (1) The affiliated organizations constituted a business unit operated as a single business enterprise and owned by substantially identical stockholders, and were in substance and reality a single business entity; and, therefore, the corporate forms of the affiliated units should be disregarded and the group should be assessed as one corporation and the consolidated net loss treated the same as the net loss of a single non affiliated corporation. (2) The members of each affiliated group had agreed in writing among themselves, as authorized under Section 240 of the Revenue Acts of 1921, 42 Stat. 260, 1924, 43 Stat. 288, and 1926, 44 Stat. 46, that the Commissioner of Internal Revenue was authorized and directed to assess the tax accruing from the affiliated members against the Edward Hines Lumber Company in the case of one group and against the Trustees of Lumber Investment Association of the other group; and, therefore, the designated corporations had become the sole taxpayers for their respective groups and should be permitted to utilize consolidated net losses to the same extent that a single non affiliated corporate taxpayer is permitted to utilize its net loss for any taxable year.

Federal courts have disregarded the corporate form in taxation cases but only "in exceptional situations where it otherwise would present an obstacle to the due protection or enforcement of public or private rights."[9]

In Southern Pacific Company v. Lowe[10] and Gulf Oil Corporation v. Lewellyn,[11] the corporate form was disregarded for the purpose of determining whether certain transactions between related corporations were income transactions. But the opinions of the court emphasized the "peculiar facts," and in the later case of Burnet v. Commonwealth Improvement Co.[12] the Supreme Court commented upon the two earlier cases, as follows: "* * * (the latter covered in principle by the first), cannot be regarded as laying down any general rule authorizing disregard of corporate entity in respect to taxation. These cases presented peculiar situations, and were determined upon consideration of them. In the former this court said [page 338, 38 S.Ct. page 543]: 'The case turns upon its very peculiar facts, and is distinguishable from others in which the question of the identity of a controlling stockholder with his corporation has been raised.'"

The reason for the holdings in Southern Pacific Company v. Lowe and Gulf Oil Corporation v. Lewellyn, supra, seems to be that to attach the usual consequences of corporate personality, under the peculiar circumstances of the two cases, would result in creating a fictitious income, contrary to the intent and purpose of the revenue act. We do not believe that the decisions of the federal courts authorize disregarding of corporate form in respect to taxation except in situations where to regard the form would produce a result contrary to the intent of the applicable statutory provision.

But in the instant case disregarding of the corporate form would result in a special deduction which is not available if the corporate forms of the affiliates are given their usual legal significance under provisions of the revenue acts. Moreover the corporate entity is treated as a thing of substance under the revenue acts and not merely as a matter of form. The revenue acts graduate tax burdens and deduction privileges not only according to the amount of income but also on the basis of the form of business organizations which is utilized to produce taxable income; and in respect to the foregoing, it is the policy of the acts to treat as a corporation any association which is so organized that it, in fact, does enjoy the business advantages which the law grants to de jure corporations. And in addition

9 New Colonial Ice Co. v. Helvering, 292 U.S. 435, 442, 54 S.Ct. 788, 791, 78 L.Ed. 1348.

10 247 U.S. 330, 38 S.Ct. 540, 62 L.Ed. 1142.

11 248 U.S. 71, 39 S.Ct. 35, 63 L.Ed. 133.

12 287 U.S. 415, 53 S.Ct. 198, 199, 77 L.Ed. 399.

to the foregoing considerations it is necessary to recognize that deductions and exemptions in taxation are purely legislative concepts which are available only to persons designated, and upon the conditions imposed, by the statute. They are matters of legislative grace (New Colonial Ice Co. v. Helvering, supra); and judicial decisions uniformly hold that authority for deductions or exemptions must be found in specific statutory provisions.

In our opinion the facts of the instant case do not justify this court's disregarding the corporate forms of the affiliates; and unless authority can be found in specific statutory provisions to carry forward the consolidated net losses of the affiliates for deduction purposes, no such authority exists.

By statutory declaration the term net loss "means only net losses" of a taxpayer; and it is only "any taxpayer" that has sustained a "net loss" that can utilize such net loss as deduction in succeeding taxable years. And by statutory definition the term "taxpayer" includes any person, trust or estate subject to a tax *imposed* by the revenue act. The term "person" includes partnerships and corporations as well as individuals: and the term "corporation" includes associations, joint stock companies, and insurance companies. But a group of "corporations" is not a person within the foregoing definition. Since the statutory definition of "taxpayer" is exclusive, the federal courts do not have the power to create non statutory taxpayers for the purpose of applying the provisions of the revenue acts; and unless there can be found some language elsewhere in the revenue acts which discloses an intention that a group of corporations affiliated within the meaning of Section 240 be considered a "person" subject to a tax imposed by the revenue act, the decision of the Board in the instant causes must be upheld.

It is clear that there could be no basis for the argument that the individual corporations, which are involved in the instant proceedings, may carry forward a consolidated net loss if it were not for the provisions of Section 240 which authorize these individual units to affiliate and to make a consolidated return of net income. For without this authorization there would be no legal recognition of a consolidated return for any purpose. But there is no language in Section 240 which purports to deal with a consolidated *net loss* for deduction purposes, either for the current taxable year or for any succeeding taxable year; nor is there any provision which indicates an intention to make a group of affiliated corporations a taxpayer entity which could sustain a "net loss".

Section 240 does not purport to subject the affiliated group, as a unit, to a tax *imposed* by the revenue act; and the "total tax" is not a tax imposed by the act but is merely a sum arrived at through a special method of computation authorized by the act, provided the affiliates elect to make a consolidated return.

Statements by different courts indicate an understanding that the group of affiliates is merely a tax computing unit and not a taxpayer. In Woolford Realty Co., Inc. v. Rose, Collector of Internal Revenue,[13] is the following statement: "* * each of two or more corporations joining (under section 240) in a consolidated return is none the less a taxpayer. Commissioner of Internal Revenue v. Ben Ginsburg Co. (C.C.A.) 54 F.2d 238, 239. By the express terms of the statute, section 240(b), the tax when computed is to be assessed, in the absense of agreement to the contrary, upon the respective affiliated corporations 'on the basis of the net income properly assignable to each.' 'The term "taxpayer" includes any person * * * subject to a tax imposed by this Act.' Revenue Act of 1921, § 2 (9), 42 Stat. 227. A corporation does not cease to be such a person by affiliating with another."

In Delaware & Hudson Co. v. Commissioner of Internal Revenue,[14] the pertinent sections of the revenue act were construed to mean that the deduction of a prior tax years loss is allowed only to the taxpayer and that the affiliated group is not the taxpayer. And it was held that the net loss of an affiliate in a prior tax year could not be carried forward and applied against the group net income of the succeeding tax year. In its opinion in the foregoing case the court recognized that in Woolford Realty Co. v. Rose, supra, the loss sought to be carried over happened in a year preceding affiliation, but was of the opinion that the ratio decidendi of that decision applies with equal force to a case in which

---

[13] 286 U.S. 319, 52 S.Ct. 568, 570, 76 L.Ed. 1128.

[14] 2 Cir., 65 F.2d 292, 294.

the loss sought to be carried forward is incurred during the period of affiliation; and the court was of the opinion that "without disregarding the necessary implications, indeed the express declarations, of the Supreme Court," we can not hold "that such losses may be brought into hotchpot."

We are of the opinion that the Board of Tax Appeals correctly decided that an affiliated group of corporations is recognized under Section 240 only as a tax computing unit for the current taxable period, and in holding that the privilege of a corporation taxpayer to carry forward a net loss from one taxable year as a deduction from a net income of a succeeding year can be exercised only by the individual affiliate which has sustained the net loss.

We hold that the Board's decisions in causes Nos. 6436 and 6437 are correct, and they are affirmed.