**SECURITIES AND EXCHANGE COMMISSION v. UNIVERSAL SERVICE ASS'N et al.**

No. 6741.

Circuit Court of Appeals, Seventh Circuit.

June 23, 1939.

Rehearing Denied Aug. 28, 1939.

234

Justus Chancellor and Justus Chancellor, Jr., both of Chicago, Ill., for appellants.

W. McNeil Kennedy, of Chicago, Ill., and Chester T. Lane, Gen. Counsel, Securities and Exchange Commission, and O. John Rogge, Asst. Gen. Counsel, both of Washington, D. C. (John Logan O'Donnell, of Washington, D. C., of counsel), for appellee.

Before EVANS, MAJOR, and TREANOR, Circuit Judges.

TREANOR, Circuit Judge.

This is an appeal from the decree of the District Court enjoining violations of Sections 5 and 17 of the Securities Act of 1933,[1] as amended. The action below was prosecuted by the Securities and Exchange Commission pursuant to authorization of Section 20(b) of the act, 15 U.S.C.A. § 77t (b). The decree enjoined six defendants, C. Franklin Davis, Justus Chancellor, Universal Service Association, a corporation, Universal Order of Plenocrats, an association, Harry N. Andreasen, and Samuel R. Maxwell. The last two named defendants have not joined in this appeal. All of the defendants have been engaged in the promotion of a concept which they styled "plenocracy." The following statement respecting plenocracy is found in literature distributed in connection with its promotion: "The light breaks through to those who get the vision of plenocracy. Plenocracy is a word to be conjured with. It is a coined word and means the power of plenty, the science of creating abundance for all. It is a word with a halo around it, because it is in the spiritual realm of life; and it is the personification of the economic law of the Lord, so beautifully portrayed in the Bible."

Representations were made that in applied "plenocracy" contributions of money are coordinated with labor and land in an agricultural enterprise conducted in harmony with "the science of creating abundance for all" ; that "increase from Mother Earth is naturally and continually increasing and is, therefore, designated in plenocracy as 'natural increase;' " that in cycles of five years this "natural increase" amounts to 150% of amounts contributed to plenocracy, and that, therefore, there is assured profit of 30% per annum with no chance of risk or loss to the contributor.

Prior to 1933 the defendants-appellants, Davis and Chancellor, promoted plenocracy through a corporate instrumentality, the Citizens Universal Service Company, and an association, the Universal Service Association. Chancellor was president and Davis was secretary-treasurer of the corporation. The Service Company employed representatives to solicit contributions, the representatives being styled "registrars" and the contributors, "members." A prospective "member" was given an application blank to sign which was accepted by the corporation, Davis and Chancellor signing the acceptance. By the terms of this instrument, monetary contributions were to be used by the company to grow and market special crops by "intensive scientific methods" ; and at the end of five years there would be returned to each member an amount equal to total contributions plus 30% per annum, such returns to be either in cash or by deed to a "little farm" at the election of the member.

On the reverse side of the application appeared a "little farm ownership table" which contained representations of various forms of return based upon 30% per annum profit. The following statements are contained in the table: "Pay $1.00 per month for five years and receive deed to 'little farm' of not less than ½ acre nor more than 3 acres, worth $150 or take your share of the profits in cash from special crops grown by Intensive Farming Methods."

In 1933 the Universal Service Association, a defendant herein, was incorporated under the laws of Illinois as a non-profit corporation. It took over the activities carried on by the two prior organizations and Davis and Chancellor continued to act

---

[1] 48 Stat. 74; 15 U.S.C.A. § 77a, et seq.

as president and secretary-treasurer respectively. This corporation used four forms of "applications for enrollment." The conception of plenocracy and the representations connected with the promotion thereof were substantially the same as had been made in connection with the activities of the earlier organizations. The essential appeal to those who were solicited to apply for enrollment was the representation of a gain of 30% to be returned to the enrollee in accordance with the "little farm ownership table" or "the natural increase table." An intensive advertising and soliciting campaign was carried on by the corporation and numerous pamphlets were distributed. Photostatic copies of checks were exhibited as a representation that the originals had been sent to "members" as "natural increase." One item of publicity was a photograph of a group of gentlemen who were represented to be the "faculty and Board of Trustees—Justus Chancellor, President of the Board." There was a list of names of persons who were represented as being members of the faculty in various departments, including Bureau of Social Service, Division of Health and Home Economics, Christian Economics, Metaphysics, Bureau of Technology, Philosophy and Agriculture. C. Franklin Davis was listed as director of finance. Maxwell, a defendant below, who has not appealed, testified that he "was the only one of the faculty that functioned" ; and that there was a lecture hall but that he "never used it." The equipment of the University appeared to consist of five books and five lessons on plenocracy written by Maxwell, who was employed by Davis and Chancellor at a time when they were "carrying out the business of rendering service (plenocracy) to the citizens."

On February 14, 1936, a judgment of ouster was entered by the Circuit Court of Cook County on the ground that the corporation was in fact carrying on a business for profit in violation of its corporate powers. The judgment prohibited the corporation from doing anything that might lead any person to believe or expect that by contributing to the corporation it would receive any profit "in money distribution or the natural increase of the soil or natural resources or in anything of value whatsoever." The judgment ousted the corporation from exercising any function other than giving instructions in the economic theory designated by it as plenocracy, and provided that in so instructing "it shall not demonstrate its theories by actually engaging in or supervising on its own behalf or on behalf of any other person any agricultural enterprise." This judgment was affirmed by the Illinois Supreme Court.[2]

On February 22, 1936, a "voluntary association" was formed under the name of "Universal Order of Plenocrats" which continued the promotion of plenocracy by substantially the same methods that had been practiced by Davis and Chancellor in connection with the Citizens Universal Service Company, the Universal Service Association, and in the Universal Service Association, Inc. In short, they continued the activities which had been the basis of the ousting of the Universal Service Association, Inc. Chancellor was chairman and Davis was secretary of the meeting in which the Universal Order of Plenocrats was organized and they attested the minutes of the meeting. The minutes of the meeting consisted of a document which created the association, this instrument being referred to as the "I Am" agreement, and which stated that the purpose of the association was to establish plenocracy. There were numerous signatures to this instrument in addition to those of the defendants; and in respect to the execution of the instrument Andreasen, defendant below, testified as follows: "I recognize among the signatures to Exhibit L (I Am document) * * * signatures of myself, Dr. Maxwell, C. Franklin Davis, and numerous cooperators and registrars. Some registrars were present and many cooperators. They are the people who make the contribution." This defendant stated that he had been connected with plenocracy since 1932 and that a suite of offices at 6 N. Michigan Avenue, Chicago, Illinois was the office of the Universal Service Association and Universal Order of Plenocrats, and that he was employed there. He further testified that there was no difference in the way "the business was run under the different names."

The Universal Order of Plenocrats adopted three forms of application for enrollment which did not differ in substance from the forms used in connection with the earlier organizations. It used the

---

[2] People ex rel. Hughes, Secy. of State v. Universal Service Association, Inc., 365 Ill. 542, 7 N.E.2d 310.

advertising material of the prior enterprises and its activities were unchanged. The accounts of the various enterprises had been kept as those of one continuous business. One ledger card was kept for each "member," but the cards, which show all payments made, do not indicate the payee. Defendants insist that the foregoing is not significant since according to the testimony of Davis the cards were the property of the contributors and kept by the contributors' agent. But Davis produced the cards on subpoena directed to him and the evidence and findings do not support the existence of an agency relationship between Davis and the contributors in respect to the custody of the cards.

On March 14, 1936, approximately a month after the formation of the Universal Order of Plenocrats, the present action was instituted, naming as defendants Davis, the two non-appealing defendants, Maxwell and Andreasen, and the Universal Service Association, Inc. The original bill set out as exhibits the four application forms used by the Universal Service Association. Thereafter, upon leave of court, the plaintiff-appellee filed an amendment (and supplement) to the original bill of complaint adding as parties defendant Justus Chancellor and the Universal Order of Plenocrats. The bill, as amended, alleged, and the court below found, that the individual defendants were performing the acts and practices complained of through the use of the variously styled enterprises. The amendment added the three forms adopted by the Universal Order of Plenocrats. Pending the final decree, a preliminary injunction was issued which enjoined each of the six defendants from using the seven exhibits or "any other securities of substantially like kind and character * * * whether issued in the name of Universal Service Association or in the name of the Universal Order of Plenocrats, or in any other name or by any other designation * * *." Despite the foregoing injunction the Universal Order of Plenocrats carried on solicitations for payments, and used an instrument which while not an exhibit to the bill, was substantially the same as the exhibits to the bill. One of the registrars testified as follows: "I took applications under the name of Universal Service Association and when the Universal Order of Plenocrats was organized, I went out and took them under that name * * *. The applications we have been getting since the injunction in this case * * * were on the endowment blanks we are now using. Our attorney, Mr. Chancellor, told us that there was no injunction against using that endowment blank, that the injunction was against using the blanks in the name of the Universal Association."

Defendants contend, and the evidence supports their contention, that the three forms first adopted by the Universal Order of Plenocrats were not used; but it is unquestioned that a form which is in evidence as exhibit (1) was used. This new form, however, does not differ in substance from the earlier forms. It has a new caption, "American Foundation for creating an endowment to be used in conformity with the Universal Service Plan of the Universal Order of Plenocrats." There are recitals about a University of Plenocracy, the principles of plenocracy, divine law, a desire to assist in "founding, establishing and maintaining" a University of Plenocracy. It is further recited that the "endowment" shall be used, if the Universal Order sees fit, "in coordinating money, labor, land to produce a natural increase annually from the natural resources of the earth, to become a part and parcel of the said endowment." Paragraph three of the instrument directs that each twelve months 30% of this endowment be set aside and distributed among plenocrats; paragraph 4 directs that at cycles of 5 years the Universal Order "if in its judgment it can be done without impairment of this endowment" shall set aside a sum equal to the contributions and "distribute same in accordance with its plan" among plenocrats. Paragraph 7 states as a purpose of this endowment the "furnishing plenocrats sufficient natural resources and products to properly maintain and support them in comfort." A blank was provided for the "name of beneficiary" to whom whatever accrued benefits were to be delivered in the event of the death of the contributor. The earlier representations, publicity, and solicitations were continued, and the "little farm table" and mathematical distribution tables were used as before. An investigator for the Commission attended two meetings at which a "registrar" lectured. This investigator testified that at such meetings, which were held at the time that exhibit (1) was being used, mostly elderly persons and more women than men attended. The lecturer stated that Chancellor was one of the leaders of plenocracy and asked for

help "to get his message across", and stated that "they would accept contributions" and that "at the end of five years they (contributors) would receive a lump sum if they wish and their 30% " ; and that "they could use the money in any way they saw fit."

The specific points argued as a basis for reversal may be summarized thus:

1. The court below erred in holding that exhibit 1 was a security.

2. The court deprived the contributors of their right to receive any return from defendants for contributions already made.

3. The court had no jurisdiction over the Universal Order of Plenocrats, since it was a voluntary association.

4. It was error to include Chancellor in the injunction.

5. The court erred in finding that insolvency was a material representation required by the statute to be made by defendants.

6. The court committed Davis to the custody of the marshal for one day for disobeying a subpoena. This biased the court and the court permitted its personal feeling to control the decision.

7. The amendment to the bill was improper.

The court found that the applications for enrollment and exhibit (1) were securities; that defendants used the mails and instruments of interstate commerce without complying with registration and prospectus provisions of the act.

■ In respect to the foregoing finding defendant's contention is that the contributor is the moving party since he makes the application, defendants' point being that the "application" moves from the alleged investor to the alleged security issuer, whereas the Securities Act contemplates the contrary; and defendants further contend that exhibit (1) represents merely a voluntary donation to a charitable use. The various application instruments are in form consistent with defendants' contention. But decisions uniformly hold that in determining whether a particular instrument is a security within the meaning of the act the substance of the transaction and of the relationship between the alleged issuer and alleged security holder will control as against the form of, the alleged

security. In Securities and Exchange Commission v. Crude Oil Corporation[3] this Court held that the instrument purporting to evidence a sale of a commodity constituted a security; and in that case this Court referred to numerous contracts of widely varying content which had been held under state laws to be securities, and listed many of them.

One of the recognized purposes of the Securities Act is to compel full disclosure of the truth, and the form of arrangements or transactions whether they be styled sales of commodities, agencies, leases, applications, endowments or by any other name must be tested by the rule of substance. It is true that when Congress attaches consequences to form, such as the precise wording of an instrument,[4] or the corporate device for tax purposes,[5] the courts may not regard substance as controlling. But in this case we are controlled by an act of Congress which is intended to prevent overreaching and to mandate "fair disclosure" ; and the Congressional expressions relating to "securities" are so broad and all-inclusive that we must recognize that the Congressional intention is to give effect to substance and not to form.

Plaintiff has suggested as a definition of the general term "security" the following: "The investment of money with the expectation of profit through the efforts of other persons." Such definition has support in state decisions and describes a relationship which is in substance that of a security investor.

■ The "applications" in the instant case, including exhibit (1), must be treated as securities within the meaning of "securities" as used in the Securities Exchange Act, 15 U.S.C.A. § 77b et seq. In the light of all of the acts of defendants they gave an assurance that by placing money with the defendants a "contributor" would receive 30% profit per annum from agricultural operations in which he takes no part other than making his contribution. The conduct of defendants amounted to an offer of participation in an enterprise from the profits of which the contributors were assured extraordinary returns. The Universal Order of Plenocrats was organized to and did carry on the activities from which the Universal Serv-

---

[3] 7 Cir., 93 F.2d 844. See Annotations 87 A.L.R. 42.

[4] Lee v. Pero, 7 Cir., 99 F.2d 28.

[5] Commissioner of Internal Revenue v. Trustees, 7 Cir., 100 F.2d 18, 27 et seq.

ice Association had been ousted. Those activities were characterized by the pecuniary profit motive. The Illinois Supreme Court, 365 Ill. 542, 7 N.E.2d page 312, in its affirmance of the ouster stated that "the scheme, when reduced to its essentials, is a business arrangement designed to produce a profit." We conclude that the instruments in question are "securities" and that they do not fall within the exceptions of Section 3(a)(4) of the Securities Act, 15 U.S.C.A. §§ 77c(a)(4).

■ Defendants also urge that the court erred in enjoining the purchasers of the securities from receiving benefits thereunder. This contention rests upon a misunderstanding of the decree. The District Court found that defendants paid out sums of money to some contributors under the misrepresentation that such payments represented profits earned in agricultural enterprises, when, in fact, there were no such profits and the money came from contributions of other contributors. Such payments were made by checks, and photostatic copies were exhibited to prospective contributors as a means of inducing contributions. The court concluded that such deception constituted a violation of Section 17 of the act, 15 U.S.C.A. § 77q, and decreed that defendants were enjoined from paying to contributors who became such subsequent to December 8, 1937 (the date of the preliminary injunction) sums of money "as if such money was profit earned in agricultural projects when there were and are no such profits, and exhibiting photostatic copies of checks by which such payments were made." In this there was no error. Section 17(a)(3) makes it unlawful to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon the investor. The decree forbade the continuation of the false representations of defendants to contributors who were solicited unlawfully by defendants, and forbade the making of false representations to prospective contributors. The decree did not interfere with any rights of the contributors; but it did restrain the defendants from making fraudulent distributions of funds and from making further false representations to prospective contributors.

■ Defendants' third point is that the District Court had no jurisdiction over the Universal Order of Plenocrats for the reason that it is a voluntary association. This objection is based upon the fallacious assumption that the contributors are the association. As a matter of form this can be urged with some appearance of merit. But the question really involves the merits of the determination that the various "applications" are securities and that the so-called members are in law investors on the one side and that the defendants are on the other side promoters engaged in selling investment agreements. All of the actual promoters of the association were made parties. The so-called members whose non-joinder is assumed to be fatal to jurisdiction are investors, despite the promoters' attempt to describe them as "members." For jurisdictional purposes the association was before the court since all the entrepreneurs were before the court; and the finding of the court is that the individual defendants before the court were acting in the name of Universal Order of Plenocrats.

In this view of the matter it is unnecessary to consider plaintiff-appellee's theory that under the class suit doctrine (Equity Rule 38, 28 U.S.C.A. following section 723) service upon Chancellor and Davis as officers was sufficient to bring the association before the court, and it is likewise unnecessary to consider the proposition that a statutory recognition of the existence of unincorporated associations authorizes suit against them by service on an appropriate officer.[6]

■ The fourth point of error is that the court should not have issued an injunction against Chancellor. The basis of this contention is that Chancellor acted merely as attorney. But the evidence is sufficient to justify the conclusion that Chancellor was a participant in the activities of the various plenocratic organizations. At numerous times he acted as an officer and continued to promote the enterprise. Maxwell, a co-defendant, testified that Davis and Chancellor were carrying on the business; that they employed him; and that when he submitted his discussions on the principles of plenocracy Davis instructed him to read it to Chancellor. Chancellor purported to act as the president of the University Board of Trustees, and there are numerous other facts to compel the inference that Chancellor was an active promoter of plenocracy, and the District

6 United Mine Workers v. Coronado Coal Co., 259 U.S. 344, 42 S.Ct. 570, 66 L.Ed. 975, 27 A.L.R. 762. Also, Brown v. United States, 276 U.S. 134, 48 S.Ct. 288, 72 L.Ed. 500.

Court was justified in concluding that unless he was enjoined there was reasonable and probable cause to expect future activities by him in violation of the Act.

The fifth point of error relied upon is that the court erroneously found that insolvency was a material representation which defendants were required to make under the terms of the Securities Act. The District Court found that the corporation and association defendants have always operated at a deficit and have always been insolvent, and decreed that the omission to state insolvency was a violation of Section 17. Section 17(a) (2) declares it to be unlawful "to obtain money or property by means of any untrue statement * * * or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. * * *" The defendants constantly repeated that there was no risk and no chance of loss and that there was an assured profit of 30% per annum. In order to make such statement "not misleading" it was necessary to disclose the state of insolvency. If the enterprise was in fact insolvent, a contributor could not receive anything for his investment unless new contributors were continually obtained; that is, each contributor who should be paid a return of 30% on his contribution would be paid not from any profit, but from new contributions. Such a course of business operated as a fraud upon the contributors in violation of Section 17(a) (3). Defendants attempt to answer the foregoing, in part, by urging that there was no showing of insolvency since it was not shown that any individual member of the enterprise had been shown to be insolvent. But there was no representation or assurance that any individual would pay the contributors a profit. The representation was that the enterprise would provide the funds. Defendants undertook no individual liability but confined performance to the enterprise which constituted a business activity apart from the individual's participation therein. The evidence justified the conclusion that the income of the plenocratic enterprise was wholly inadequate to supply the profits which contributors were assured would be available.

Defendants' sixth point relates to the assumed bias of the court. We find no evidence in the record of prejudice to defendants by reason of any bias of the court, and we find no evidence of the existence of the charged bias.

Defendants' seventh point relates to the alleged error of the District Court in permitting amendment to the bill of complaint and in admitting in evidence exhibit (1). The objections to the grant of leave to file the amendment for the most part rest upon the assumption that there is a difference between the four exhibits to the original bill and the three exhibits to the amended bill and exhibit (1) which was introduced in evidence. But as indicated above their differences are found only in form and in immaterial variations in wording; substantially they are the same. The amendment simply sets up conduct alleged in the original bill. The amendment was not foreign to the original bill, did not count upon separate and different transactions, and did not set forth a new cause of action, but merely sought to cure any defects in the original bill, and to join all parties who were associated in the one common course of conduct.

We do not consider it necessary to refer in detail to the liberal rule governing amendment and to the many decisions which have held in substance that "the sole controlling test should be whether the ends of justice will be promoted by the amendment." [7]

Defendants complain of the use of exhibit (1) in the trial for the reason that it was not set out in the pleadings. The general rule, however, is that a complaint need not set out the evidence, including exhibits, which may be used to support the allegations of ultimate facts. Moreover, exhibit (1) is identical in substance with the exhibits set out. No surprise was occasioned by its use.

Defendants urge that the action should have been dismissed as to the corporate defendant because it has not engaged in the sale of securities since the decree of ouster and that, therefore, injunction is unnecessary. The corporation was merely an instrumentality for use in carrying on continuous activities. Equity courts do not issue useless injunctions, but this involves an exercise of sound discretion and is not a rule of thumb. Where there is reasonable ground to apprehend that there will be resumption of illegal

[7] Mims v. Reid, 4 Cir., 275 F. 177.

240

activities, a court of equity may issue an injunction even though the activities have ceased. In view of the facts presented to the District Court, the enjoining of the corporate defendant was not an arbitrary act. The individual defendants were the moving actors and an injunction against them in their use of any of the various forms was justified.

Defendants urge the further objection that the amendment made allegations on information and belief. This objection goes to the sufficiency of the form of the pleading. Defendants state that no injunction can issue on such a pleading and cite three cases.[8] In each case cited a motion to dismiss was sustained, for reasons given in the opinion, before any evidence was taken. The cases were disposed of in the pre-trial stage. The objection to the form of the pleading is removed when the appeal is from a final decree based upon evidence and full hearing. Whether or not the pleading was subject to motion on this ground in the District Court is not the question here.[9] This Court has before it only the question whether the proof under allegations on information and belief is sufficient to sustain the final decree. Further, assuming that there was defect in form, it was harmless. Defendants were fully apprised as to what plaintiff would endeavor to prove and what they must meet in order to defeat the prayer for injunction.

We find no grounds for reversal and the decree of the District Court is affirmed.

[8] United States v. Marine, etc. Ass'n, D.C., 277 F. 830; Milliken v. Stone, 2 Cir., 16 F.2d 981; General Investment Co. v. L. S. & M. S. Ry. Co., 260 U.S. 261, 43 S.Ct. 106, 67 L.Ed. 244.

[9] Cf. on such question McQuillen v. National Cash Register Co., D.C., 22 F. Supp. 867, at page 876.