**David Nick REINHART a/k/a Rick Reinhart, Appellant–Defendant,**

v.

**Gregg W. BOECK, Appellee–Plaintiff.**

No. 06A04–0905–CV–286.

Court of Appeals of Indiana.

Dec. 18, 2009.

---

Michael L. Einterz, Andrew J. Einterz, Michael L. Einterz, Jr., Einterz & Einterz, Indianapolis, IN, Attorneys for Appellant.

Barton B. Ost, Blythe & Ost, Indianapolis, IN, Attorney for Appellee.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

David Nick Reinhart appeals from the trial court's entry of summary judgment for Gregg W. Boeck. Reinhart raises four issues for our review, which we consolidate and restate as the following dispositive issue: whether a genuine issue of material fact precludes the entry of summary judgment for Boeck on his claim that Reinhart is jointly and severally liable for his business partner's fraudulent sale of unregistered securities.

We affirm.

### FACTS AND PROCEDURAL HISTORY

The trial court's summary judgment order included a detailed, eight-page "statement of undisputed facts drawn from the designations filed in this case." Appel-

lant's App. at 10. According to the trial court:

> In October of 2005, Ronald G. Thomas began a scheme to lure David Nick Reinhart into a phony real estate business as a "partner" and stalking horse for other marks. Thomas and Reinhart first spoke on the phone. Thomas posed as an experienced real estate entrepreneur who had a partner named Josh Bach who handled construction. [*Id.* at 567 (citing Reinhart's Deposition).[1]] Thomas said that although he had a substantial line of credit he was looking for "partners" to expand the business. A few days after first speaking, Thomas and Reinhart met at a restaurant. Thomas said he was about to make $800,000 on the sale of some Castleton condominiums. Reiterating the same representations he made on the phone, Thomas continued to lure Reinhart into his business which he described as consisting of "partners." [*Id.* (citing Reinhart's Deposition).] Within a week, Thomas and Reinhart met again at another restaurant with Josh Bach. With Thomas reiterating the same sales pitch, Josh Bach "confirmed" that he was on the construction side of the business. Thomas for his part concentrated on the financial side. Immediately after this meeting the three ventured off to the west side of suburban Indianapolis to look at possible investment properties.
>
> In early November of 2005, with assurances to Reinhart that (1) he was just the sort of person Thomas was looking to work with (2) that Reinhart had the right attitude and could be trained in real estate and (3) that Reinhart's lack of experience in real estate would be a blessing because he could more easily be

---

1. In his designations to the trial court, Boeck included multiple summaries of Reinhart's testimony during a deposition and the exhibits included therein, on which the trial court substantially relied. Although Reinhart's deposition is not included in the record on appeal, Reinhart does not challenge the accuracy of Boeck's summarization of that evidence.

taught by Thomas, Thomas invited Reinhart to join the business that Thomas called [TRG]. [*Id.* at 569 (citing Reinhart's Deposition).] Reinhart agreed to enter real estate transactions with Thomas for purposes of attempting to realize profits. [*Id.* (citing Reinhart's Deposition).] Shortly after, the two co-venturers bought some real estate which was titled in Reinhart's name. [*Id.* (citing Reinhart's Deposition).]

Reinhart also began to solicit investors for TRG. [*Id.* (citing Reinhart's Deposition).] Thomas had Reinhart do this because he told him that although business was great Thomas was tapped out on his credit lines. [*Id.* at 569–70 (citing Reinhart's Deposition).] This was an assertion that Reinhart heard spoken, not just to him, but to potential investors to whom he heard Thomas speak. [*Id.* at 570 (citing Reinhart's Deposition).] Reinhart never verified that Thomas had any lines of credit. [*Id.* (citing Reinhart's Deposition).] Reinhart also, though he had asked for financial documentation from Thomas and was promised the same, never received any financial documentation. [*Id.* (citing Reinhart's Deposition).] As a matter of undisputed fact, never during their entire association together, did Reinhart ever receive any financial statements from Thomas. [*Id.* (citing Reinhart's Deposition).] Reinhart never checked with Thomas' purported lawyer to confirm the accuracy of anything Thomas said. [*Id.* at 570–71 (citing Reinhart's Deposition).] Thomas tasked Reinhart with finding a total of six investors. Thomas told Reinhart he already had three. [*Id.* at 571 (citing Reinhart's Deposition).] When Reinhart asked for the names of the investors, Thomas declined to furnish them stating that they wanted to be confidential and Reinhart did not

quibble with Thomas' position. [*Id.* (citing Reinhart's Deposition).]

An advertisement began appearing in the Indianapolis Star starting on December 4, 2005. The advertisement said:

REAL ESTATE

Serious Investor Wanted

I find the properties

Both names go on deed

Profits split 50/50

$15K–$80K per deal

Call Nick @ 317–873–xxxx

The telephone number was Reinhart's home number. When prospects would call, Reinhart would repeat the assertions made to him by Thomas. [*Id.* at 249, ¶ 106 (citing Reinhart's Deposition).] Again, and importantly, for purposes of [the Indiana Uniform Securities Act], Reinhart never obtained any information from any source—Thomas, his law-firm, independent legal counsel, any investigation, the Indiana Security Commission or otherwise—how the investments would be documented and whether they were registered or, if not, exempt. [*Id.* at 571 (citing Reinhart's Deposition).]

To prospects who would call, including eventually Boeck, Reinhart would explain that he was working with Thomas[,] an experienced real estate investor. [*Id.* at 573 (citing Reinhart's Deposition).] He and Thomas were looking for investors to expand their business. [*Id.* at 573 (citing Reinhart's Deposition).] Investors would take 50% of the profits from investments and Reinhart and Thomas would split the other 50%. [*Id.* at 251 ¶ 121, 573 (citing Reinhart's Deposition).] Reinhart would attempt to

get the prospect to meet with [him] and Thomas. [*Id.* at 573 (citing Reinhart's Deposition).]

In his first contact with Boeck, a return call to him after Boeck had left a message responding to the ad, Reinhart told Boeck that *"we* are looking for investors in our real estate business[";] that there were *three partners including him;* that *"we* buy properties . . . in foreclosure . . . and in volume from banks[";] that *"we* do two things with these properties; short sale and lease to own[";] that *the partners* concentrated on various aspects of the business; that *"we* make between $12,000 and $15,000 profit on each house sold in a short sale (there were 100 short sales for the partnership in the previous year)[";] and that *"we* made in excess of $1,000,000 last year." [*Id.* at 574–75 (citing Boeck's Affidavit); *id.* at 576–78 (citing Reinhart's Deposition).] Boeck was interested and told Reinhart he'd like documentation. Reinhart told Boeck that documentation could be furnished by [him] and *his partners.* [*Id.* at 578 (citing Reinhart's Deposition).] He indicated that the documentation would be detailed. [*Id.* (citing Reinhart's Deposition).] Boeck, thinking that he liked what he heard and wanted to hear more, agreed to meet Reinhart and Thomas at a restaurant for breakfast.

Reinhart knew that it was false when he said "we buy properties . . . in foreclosure . . . and in volume from banks." [*Id.* at 576 (citing Reinhart's Deposition).] He'd never done that. [*Id.* at 576–77 (citing Reinhart's Deposition).] Reinhart had no knowledge of the truth of the statements that his partners did 100 short sales in the previous year, that the partners made about $12,000 to $15,000 per short sale, or how much the partners made in the previous year.

[*Id.* at 577 (citing Reinhart's Deposition).] Reinhart did not know because he had never received documentation. [*Id.* at 576–77 (citing Reinhart's Deposition).] Reinhart had never actually been involved in any lease[-]to[-]own transactions with the partners. [*Id.* at 576 (citing Reinhart's Deposition).]

On December 22, 2005, a meeting occurred with Boeck, Thomas and Reinhart. Thomas spun a tale of his great real estate experience, acumen and success, and yet it was a sad tale inasmuch as his partners' business was so good that even with the prodigious credit of the partners it was short on capital and needed money. That's why they were looking for five or six more investors— they'd already had found three.

The business, consisting of the three partners Thomas, Reinhart and Bach[,] were splitting the profits three (3) ways equally. [*Id.* at 579 (citing Boeck's Affidavit); *id.* at 581 (citing Reinhart's Deposition).] They were generating profits from buying twenty to twenty-five homes per month from banks, fixing them up with several construction crews who worked for them under direction of partner Bach and having the property back on the market in two to ten days. [*Id.* at 579–81 (citing Boeck's Affidavit).] The investment of the partners into more expensive $300,000–$500,000 homes was "eating into their working capital" and they needed more investors to grow their "crazy good" business even faster. [*Id.* (citing Boeck's Affidavit); *id.* at 582 (citing Reinhart's Deposition).] None of this was true.

Reinhart was largely silent during this meeting but gestured and appeared to assent as Thomas spoke. Reinhart did add that he was a pharmaceutical salesmen and that he was probably going to quit that job to go into real estate full

time with his partner Thomas. [*Id.* at 581 (citing Boeck's Affidavit.]

Although lacking as clear a recollection, Reinhart in his deposition disputes substantially none of Boeck's version of the first conversation between the two. Reinhart disputes substantially none of Boeck's account about the breakfast meeting with Thomas and Reinhart. He does recall Thomas stating that he, Reinhart and Bach were partners equally splitting profits. He admits that that statement was false and he knew it at the time because Reinhart had never received any distributions by that point. Also concerning one other particular statement, that the partners were purchasing 20–25 homes per month from banks, Reinhart knew at the time of only one home purchased from a bank prior to December 22, 2005. As to the remainder of Thomas' sales pitch which contained many false factual assertions, Reinhart at that time had no independent basis to be able to know whether the statements of this man Thomas *who was calling himself Reinhart's partner* were true. [*See generally id.* at 582–85 (citing Reinhart's Deposition).]

In January of 2006, just a few days after the December 22, 2005[,] meeting, Thomas confessed that of the "20–25 homes" the partnership bought in the preceding month, the real number was actually zero. [*Id.* at (citing Reinhart's Deposition).] At this point, did Reinhart disengage and warn Boeck? No. [*Id.* (citing Reinhart's Deposition).]

Then—perhaps he was worried about his stalking horse becoming conscious—Thomas sent Reinhart a faxed note which could be described as a "pep-talk." [*Id.* at 588–89 (citing Reinhart's Deposition).] Therein he reiterated what good feelings he had had about Reinhart and how he had sensed that Reinhart was the right individual to "form a partnership with." [*Id.* (citing Reinhart's Deposition).] He then used the word partnership or partner three additional times to describe their relationship. [*Id.* (citing Reinhart's Deposition).] Did Reinhart respond and clarify, "No, Mr. Thomas[,] there is no partnership"? No. Did Reinhart respond and clarify, "Before we form a partnership I am going to need more documentation"? No. Instead he and Thomas opened a bank account together three days later under the name "Thomas Real Estate Group, Inc." [*Id.* at 268 ¶ 260, (citing Reinhart's Deposition).] The account numbers ended in 5855. No money was placed in this account. [*Id.* at 589 (citing Reinhart's Deposition).] Eventually, the Thomas Real Estate Group leased office space—Reinhart signed the lease in his own name. [*Id.* at 590–91 (citing Reinhart's Deposition).]

A few days after the faxed "pep-talk" and the bank account opening, Boeck called Reinhart. Thomas had not called Boeck back about Boeck's interest in investing. Reinhart explained that Thomas was busy due to partner Bach slacking off on his construction duties. Again during this call, Reinhart several times used the words "partner" or "partnership" to refer to his relationship with Thomas. Reinhart told Boeck that he would relay the message to Thomas, his partner and that Thomas would call him back. [*See generally id.* at 589–90 (citing Boeck's Affidavit).]

On February 16, 2006[,] and again on February 23, 2006[,] Boeck invested money with Thomas. In both transactions, Boeck was told by Thomas that he was investing in the partnership and that the partnership would in turn lend the money to two individuals who could turn fast profits and pay back a return.

The first individual was a Brian Thompson. The second was a David Leckner. These ended up being fictitious persons. For the Thompson deal, [the February 16 deal,] Boeck would lend the partnership $125,000.00 and be paid within 60 days the sum of $150,000.00[,] a 20% return. For the Leckner deal, [the February 23 deal,] Boeck would lend the partnership $72,000.00 and be paid a total of $96,400,[2] a 33% return[,] within 30 days. Boeck signed documents entitled "Promissory Notes."[3] [Boeck] was promised that his name would go on the deed or mortgage to protect his investment and that documentation would be furnished. Boeck wired the funds to a bank account ending in 5855 per Thomas' instructions on or about February 16th and again on February 23rd.

Boeck never got his deeds or mortgages and became worried. Calls ensued. Thomas ducked Boeck. Thomas later, on or about March 9, 2006, furnished phony promissory notes purportedly signed by Thompson and Leckner which, although they may be said to be "documents," did not match the documentation that Boeck was promised. The deadlines for Boeck's splendid returns came and passed without realization. Boeck called Thomas daily. Thomas stonewalled.

On or about May 2, 2006, Boeck got a check for $60,000 from Thomas, albeit from a different account [than the one] into which he had wired the money. Boeck never got another dime out of TRG or Thomas. He thus lost $137,000.00 in principle and further was never repaid any return.

Reinhart did get some money though and it is directly traceable to Boeck's wire-transfers. Backing up to January[,] the account ending in 5855 originally had a zero balance. [*Id.* at 596 (citing Reinhart's Deposition).] From February 1, 2006[,] through February 28, 2006[,] there were 5 deposits totaling $200,100.00. [*Id.* (citing Reinhart's Deposition).] Two were the wires from Boeck totaling $197,000.00. [*Id.* (citing Reinhart's Deposition).] In March of 2006 an additional $5,400 was deposited into account ending 5855. [*Id.* at 597 (citing Reinhart's Deposition).]

Money flowed out of the account just as fast as it flowed in. Reinhart, almost certainly unaware that Boeck's money deposited on February 16, 2006[,] was supposedly earmarked to the "Thompson deal[,]" got $20,000.00 on February 17, 2006. [*Id.* (citing Reinhart's Deposition).] Reinhart got another $30,000.00 on February 21, 2006. [*Id.* (citing Reinhart's Deposition).] Reinhart got another $15,000.00 on February 23, 2006. [*Id.* (citing Reinhart's Deposition).] Reinhart deposited $65,000.00 into personal accounts over this same time frame. [*Id.* at 600 (citing Reinhart's Deposition).] There is no genuine issue of material fact that Reinhart was unjustly enriched with $65,000.00 of Boeck's money. Thomas took money too—$30,000.00 on February 17, 2006, $20,000.00 and $10,000.00 for two separate withdrawals on March 6, 2006. By March 31, 2006, the account was basical-

---

**2.** The face of this note provided for a return of $86,400. However, when Thomas faxed a copy of the note back to Boeck, he stated that he and Boeck would also "split an additional 20k of profit." Appellant's App. at 412. The trial court's statement, then, accounts for Thomas' promise of an additional $10,000.

**3.** Although titled "Promissory Notes" and referred to as "notes" in this opinion, as discussed below the documents are not commercial paper. *See Manns v. Skolnik,* 666 N.E.2d 1236, 1243 n.4 (Ind.Ct.App.1996).

ly depleted. [*Id.* at 597 (citing Reinhart's Deposition).]

Finally, according to a designated certification by the Indiana Securities Commissioner, Thomas Real Estate Group, Inc. never registered any securities with the Indiana Securities Division and did not apply for an exemption from registration.

*Id.* at 10–17 (emphases original; footnotes omitted).

On September 21, 2007, Boeck filed his complaint against Reinhart, in which Boeck alleged that Reinhart was liable for Boeck's lost February 16 and February 23 investments. Specifically, Boeck alleged five theories of liability against Reinhart: (1) "derivat[ive] liab[ility]" under the Indiana Uniform Securities Act ("the Act") for Thomas' unlawful and fraudulent sale of securities, *id.* at 562; (2) common law fraud; (3) constructive fraud; (4) unjust enrichment; and (5) "vicarious[ ] liab[ility]" for the unlawful and fraudulent acts of a "business partner," Thomas, *id.* at 563. Reinhart filed a timely answer and moved for summary judgment on all counts. Boeck then voluntarily dismissed his allegation of common law fraud and filed a cross-motion for summary judgment on the counts alleging derivative and vicarious liability. After a hearing, on February 16, 2009, the court granted summary judgment for Boeck on those two allegations, as well as the remaining alternative theory of unjust enrichment. The court granted summary judgment for Reinhart on Boeck's allegation of constructive fraud. The court then entered money judgments for Boeck on each of the three counts. The court capped that monetary award at $229,806.20, the amount Boeck sought on his first theory of liability.

In its order, the trial court, relying entirely on this court's opinion in *Manns v. Skolnik*, 666 N.E.2d 1236 (Ind.Ct.App. 1996), concluded that the promissory notes exchanged between TRG [4] and Boeck (hereinafter, "the notes") were securities under the Act. The first of the two notes was executed on February 16, 2006, and the second note was executed on February 23, 2006. The first note stated:

> For value received, the undersigned promise(s) to pay to the order of Gregg W. Boeck the sum of [$150,000] ... within sixty (60) days from the date of this note or April 17, 2006, interest upon the unpaid principal balance at a rate of zero percent (0%) per annum from the date of this instrument until maturity.

Appellant's App. at 760. The first note was executed by Boeck and "Thomas Real Estate Group, Inc." by "Ron Thomas, President." *Id.* at 761. Also on February 16, 2006, Boeck deposited into TRG's bank account the sum of $125,000. The second note stated:

> For value received, the undersigned promise(s) to pay to the order of Gregg W. Boeck the sum of [$86,400] ... within thirty (30) days from the execution of this note or March 17, 2006, with interest upon the unpaid principal balance at the rate of zero percent (0%) per annum from the date of this instrument until maturity.

*Id.* at 413. The second note identified Boeck as the "promisor" and "Thomas Real Estate Group, Inc.," by "Ronald G. Thomas, Jr., President," as the "promisee." [5] *Id.* at 414 (capitalization removed). On February 23, 2006, Boeck wire trans-

---

4. As discussed below, it is irrelevant that TRG, a corporation, signed the notes because Reinhart is estopped from using TRG's corporate identity as a defense.

5. The second note misidentified the promisor and the promisee.

ferred into TRG's bank account the sum of $72,000.

Finally, in a footnote, the court stated as follows:

> A key legal issue is whether Reinhart is estopped from claiming that he was not a partner of Thomas in [TRG]. One is a partner by estoppel
>
>> when a person, by words spoken or written or by conduct, represents himself, or consents to another representing him or any one, as a partner . . . with one . . . or more persons not actually partners. I.C. 23–4–1–16(1).
>
> A partner by estoppel
>
>> is liable to any such person to whom such representation [of actual partnership] has been made, who has, on the faith of such representation, given credit to the actual or apparent partnership. *Id.*

The "pep-talk" note is basically a private communication—no holding out to third parties, in particular Boeck. But it shows that Reinhart probably thought he was a partner of Thomas in TRG. It shows the absence of an objection of Reinhart to Thomas' characterization of the two of them as partners.

Of similar significance is a "Shareholder Purchase Agreement" that Reinhart signed on or about January 25, 2006. Like the "pep-talk" note, this agreement is a private communication between Reinhart and TRG, Inc. by its "officer" Thomas. A shareholder interest purchase agreement between a corporation and an individual would ordinarily be a means by which the corporation would sell stock or other equity interests to a buyer. But this agreement contains contradictory language that the parties to the contract are to be "partners" and the "partnership" can be dissolved by a Partnership Dissolution Agreement. Although not a holding out of a partnership to third parties, the agreement shows that Reinhart thought of himself as partner of or with Thomas of or with TRG. TRG happened to be a corporation. But whatever its corporate form, the designated evidence shows that Reinhart did not consider TRG, Inc. to be anything other than Thomas. *The designated materials are replete with uncontroverted instances of Reinhart holding himself out to Boeck as a partner in TRG with Thomas and instances where Thomas, with Reinhart present[,] did the same.*

*Id.* at 14–16 n. 3 (first alteration original; emphasis added). This appeal ensued.

## DISCUSSION AND DECISION

### Standard of Review

Reinhart appeals from the trial court's grant of summary judgment for Boeck.[6] Our standard of review for summary judgment appeals is well established:

> When reviewing a grant of summary judgment, our standard of review is the same as that of the trial court. Considering only those facts that the parties designated to the trial court, we must determine whether there is a "genuine issue as to any material fact" and whether "the moving party is entitled to a judgment a matter of law." In answering these questions, the reviewing court construes all factual inferences in the non-moving party's favor and resolves all doubts as to the existence of a material issue against the moving party. The

---

6. Boeck does not challenge the trial court's grant of summary judgment for Reinhart on the allegation of constructive fraud.

moving party bears the burden of making a prima facie showing that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law; and once the movant satisfies the burden, the burden then shifts to the non-moving party to designate and produce evidence of facts showing the existence of a genuine issue of material fact.

*Dreaded, Inc. v. St. Paul Guardian Ins. Co.*, 904 N.E.2d 1267, 1269–70 (Ind.2009) (citations omitted). The party appealing from a summary judgment decision has the burden of persuading this court that the grant or denial of summary judgment was erroneous. *Knoebel v. Clark County Superior Court No. 1*, 901 N.E.2d 529, 531–32 (Ind.Ct.App.2009). Where the facts are undisputed and the issue presented is a pure question of law, we review the matter *de novo*. *Crum v. City of Terre Haute ex rel. Dep't of Redev.*, 812 N.E.2d 164, 166 (Ind.Ct.App.2004).

Here, the parties raise numerous issues for our review, including whether the trial court erroneously granted summary judgment for Boeck on his alternative claims of unjust enrichment and vicarious liability.[7] But the trial court's order on summary judgment expressly limited Boeck's recovery to the amount sought on his initial theory of liability: whether Reinhart has derivative liability for Thomas' fraudulent sale of securities under the Act. Because we affirm that decision, we need not consider the trial court's entry of judgment on the alternative theories.

### Joint and Several Liability under the Act

Under Indiana law at the time of the transactions at issue, it was "unlawful for a person to offer or sell a security ... unless ... it is registered under this chapter."

I.C. § 23–2–1–3 (2005) (effective through June 30, 2008). The Act provided for civil liability in the event of the following:

(a) A person who offers or sells a security in violation of this chapter, and who does not sustain the burden of proof that the person did not know and in the exercise of reasonable care could not have known of the violation, is liable to any other party to the transaction who did not knowingly participate in the violation or who did not have, at the time of the transaction, knowledge of the violation, who may sue either at law or in equity to rescind the transaction or to recover the consideration paid, together, in either case, with interest as computed in subsection (g)(1), plus costs, and reasonable attorney's fees, less the amount of any cash or other property received on the security upon the tender of the security by the person bringing the action or for damages if the person no longer owns the security. Damages are the amount that would be recoverable upon a tender less:

(1) the value of the security when the buyer disposed of the security; and

(2) the interest as computed in subsection (g)(1) on the value of the security from the date of disposition.

\* \* \*

(d) A person who directly or indirectly controls *a person liable under subsection (a)*, (b), or (c), *a partner*, officer, or director of the person, a person occupying a similar status or performing similar functions, an employee of a person who materially aids in the conduct creating the liability, and a broker-dealer or agent who materially aids in the conduct *are also liable jointly and severally with*

7. We agree with Boeck that "Reinhart's Brief is difficult to navigate." Appellee's Brief at

17. Reinhart's brief on appeal is repetitious and lacks coherent organization.

*and to the same extent as the person,* unless the person who is liable sustains the burden of proof that the person did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist. There is contribution as in cases of contract among the several persons liable.

I.C. § 23–2–1–19 (2005) (effective through June 30, 2008) (emphases added).

Thus, to establish Reinhart's liability, Boeck, the party moving for summary judgment, had to establish that no genuine issue of material fact existed on each of the following questions: (1) that the notes were securities under the Act; (2) that a sale occurred; and (3) that Reinhart was a partner of the selling party. *See id.* Boeck also needed to establish that the purported securities were unregistered and that Reinhart was unable to establish an affirmative defense, but neither of those two potential questions are disputed in this appeal and we therefore do not consider them. *See Knoebel,* 901 N.E.2d at 531–32 (stating that it is the appealing party's burden of demonstrating that the trial court erred in granting summary judgment). We address each of the three disputed questions in turn.

### The Notes as Securities

■ We first consider whether the two promissory notes are securities under the Act. The Act defines "security" broadly and includes an "illustrative list" of numerous items, but it begins its litany of examples by stating that " '[s]ecurity' means a note . . . [or] evidence of indebtedness." [8] I.C. § 23–2–1–1(k) (2005) (effective through June 30, 2008); *Security Trust Corp. v. Estate of Fisher ex rel. Roy,* 797 N.E.2d 789, 794 (Ind.Ct.App.2003) (quoting

*Poyser v. Flora,* 780 N.E.2d 1191, 1194 (Ind.Ct.App.2003)), *trans. denied.* "The word 'security' is ordinarily used as a synonym for 'investment.' " *Holloway v. Thompson,* 112 Ind.App. 229, 42 N.E.2d 421, 424 (1942). The " 'investment of money with the expectation of profit through the efforts of other persons' is within the Act's definition of security.' " *Id.* at 424–25 (quoting *SEC v. Universal Serv. Ass'n,* 106 F.2d 232, 237 (7th Cir.1939)). The Act's provisions "shall be liberally construed to the end that: (1) the practice or commission of fraud may be prohibited and prevented." I.C. § 23–2–1–15(g) (2005) (effective through June 30, 2008).

Reinhart contends that the trial court erroneously applied this court's decision in *Manns* for several reasons. Reinhart also argues that, in any event, the notes were not evidence of an indebtedness but of loans made by Boeck. We address each of Reinhart's contentions after a review of our decision in *Manns.*

In *Manns,* we affirmed the trial court's judgment in favor of the Indiana Securities Division on the question of whether a "Compensation Agreement" between two private parties constituted a "note," and therefore a security, under Indiana Code Section 23–2–1–1(k). 666 N.E.2d at 1238–39. In that case, Manns told Easterday of "a really lucrative" business opportunity in Indonesia involving the mining of platinum. *Id.* at 1239. Eager for profit, Easterday tendered to Manns a $20,000 check and the two parties signed the agreement that Manns had prepared. *Id.* The agreement provided that, in consideration for the $20,000, Manns would return to Easterday up to $200,000 in profit within three months. *Id.* Manns neither returned

---

8. As noted above, the Act's use of the term "note" is distinct from the definition usually applied in Indiana's commercial law statute, Indiana Code Section 26–1–3.1–104. *Manns,* 666 N.E.2d at 1243 n. 4.

Easterday's initial investment to her nor forwarded any of the anticipated profit to her. *Id.*

Sometime thereafter, the Indiana Securities Division ("the division") filed an administrative complaint against Manns alleging numerous violations of the Act, including failure to register a security with the division. *Id.* at 1239–40. The commissioner agreed with the division and found that the agreement was a note, among other alternative definitions of "security." *Id.* at 1240. Manns appealed to the trial court, which affirmed the commissioner's decision, and then she appealed to this court. *Id.*

On appeal, we held "that the commissioner properly concluded that the agreement constituted a note subject to securities regulation." *Id.* at 1246. In so holding, we agreed with the following law and commissioner's conclusions:

The leading federal test in this area is the "family resemblance" test enumerated by *Reves v. Ernst & Young,* 494 U.S. 56, 65–66, 110 S.Ct. 945, 951–952, 108 L.Ed.2d 47 (1990), *reh'g denied.* The "family resemblance" test begins with the presumption that a note constitutes a security. *Id.* at 65, 110 [S.Ct.] at 951. This presumption may be rebutted only by showing that the note bears a "strong resemblance" to one of seven enumerated instruments deemed not to be "securities" within the meaning of the statute. *Id.* at 66, 110 S.Ct. at 951. The seven categories include: (1) a note delivered in consumer financing, (2) a note secured by a mortgage on a home, (3) a short-term note secured by a lien on a small business or some of its assets, (4) a note evidencing a "character" loan to a bank customer, (5) a short-term note secured by an assignment of accounts receivable, (6) a note which simply formalizes an open-account debt incurred in

the ordinary course of business, or (7) a note evidencing loans by commercial banks for current operations. *Id.*

The *Reves* court set forth the following four factors to use in determining whether the instrument bears a "strong resemblance" to any of these seven categories: (1) the motivations that would prompt a reasonable seller and buyer to enter into the transaction, (2) the "plan of distribution" of the instrument, (3) the reasonable expectations of the investing public, and (4) the existence of another regulatory scheme significantly reducing the risk of the instrument. *Id.* at 66–67, 110 S.Ct. at 951–952.

The commissioner applied the *Reves* test in its findings as follows:

"15. The Compensation Agreement is a note or evidence of indebtedness. Generally, for securities law purposes, the term note or evidence of indebtedness is broadly defined 'to include all contractual obligations to pay in the future for consideration presently received.' *U.S. v. Austin,* 462 F.2d 724, 736 (10th Cir.), *cert. denied,* 409 U.S. 1048 [93 S.Ct. 518, 34 L.Ed.2d 501] (1972). The Compensation Agreement is a contractual obligation of Manns to pay Easterday in the future in exchange for Easterday's initial $20,000 payment. Thus, the Compensation Agreement is a note or evidence of indebtedness.

16. The determination that the Compensation Agreement is a note or evidence of indebtedness, however, does not end the inquiry because not all notes or evidences of indebtedness are securities.... The next question in the analysis is whether that note or evidence of indebtedness is one that should be treated as a security. In a recent decision, the Supreme Court explained the 'family resemblance'

test that it applies to determine whether a note is a security. . . . *Reves v. Ernst & Young,* 494 U.S. 56, 67 [110 S.Ct. 945, 108 L.Ed.2d 47] *reh'g denied,* 494 U.S. 1092 [110 S.Ct. 1840, 108 L.Ed.2d 968] (1990). . . .

\* \* \*

18. Under the *Reves* analysis, the Compensation Agreement is a security. Since it has already been established that the Compensation Agreement is a note or evidence of indebtedness, the *Reves* analysis starts with the presumption that the Compensation Agreement is a security. That presumption may be rebutted if the Compensation Agreement is on the list of debt instruments that are not securities or if it bears a strong family resemblance (based on the four[-]factor analysis set forth above) to one of those instruments. Because the Compensation Agreement is not on the list of nonsecurities, the analysis focuses on whether it bears a strong family resemblance to any of those instruments based on the four factors listed by the Supreme Court in Reves."

Applying the four factors, the commissioner concluded that the agreement did not provide a "strong" family resemblance to any of the seven categories: "[T]he Compensation Agreement does not sufficiently resemble any of the instruments on the *Reves* list of non-securities to rebut the presumption that it is a security. It resembles those instruments based on only one of the four factors listed in *Reves* [the absence of a plan of distribution]. Since *Reves* requires a *strong* family resemblance to rebut the presumption, that one factor alone does

not provide sufficient basis to pull the Compensation Agreement outside the scope of [the commissioner's] jurisdiction. Thus, the Compensation Agreement is a note or evidence of indebtedness, and therefore a security, under the Act."

*Id.* at 1243–44 (footnote and citations to the record omitted; some omissions and alterations original).

■ The trial court here expressly relied on *Manns* in concluding that the notes were securities under the Act. We agree with the trial court. As with the agreement at issue in *Manns,* the notes here were evidence of TRG's obligation to pay Boeck in the future in exchange for Boeck's February 16 and February 23, 2006, wire transfers. Therefore, they are presumed to be securities. *Id.* (discussing *Reves,* 494 U.S. at 65–67, 110 S.Ct. 945). Boeck has satisfied his initial burden of demonstrating a prima facie claim on this issue, and it is Reinhart's burden to rebut the presumption that the notes are securities. *See Dreaded, Inc.,* 904 N.E.2d at 1269–70.

In response, Reinhart first attempts to distinguish *Manns* from his appeal based on its procedural posture. In *Manns,* we reviewed an appeal from a trial court's judgment affirming an administrative decision. Accordingly, we applied a deferential standard of review to the division's factual determinations. *See Manns,* 666 N.E.2d at 1241–42. However, we also expressly noted that "deference is not granted to an agency's legal conclusions." *Id.* at 1242. Contrary to Reinhart's argument, whether documents such as the ones here or the one in *Manns* meet the legal test outlined in Reves for a "security" is a question of law that we review *de novo. See, e.g., Reves,* 494 U.S. at 65–67, 110 S.Ct. 945. While in *Manns* we reviewed and agreed with the commissioner's as-

sessment of that legal question, that was merely because doing so saved us from having to reinvent the wheel.[9] It was not because we failed to conduct a *de novo* review of a question of law.[10] *See Manns*, 666 N.E.2d at 1243 ("we find that the agreement constituted a note subject to the securities regulation").

Next, Reinhart attempts to rebut the presumption that the notes are securities by stating that they bear a "strong resemblance to an instrument deemed not to be a security." Appellant's Brief at 24 (quotation omitted). But aside from baldly stating so, Reinhart does not identify which of the seven nonsecurities these notes resemble. He has, therefore, failed to support his argument with cogent reasoning and waived it. *See* Ind. Appellate Rule 46(A)(8)(a).

Instead, Reinhart argues that the notes were intended to "facilitate the purchase of a minor asset" and to "correct ... cash flow difficulties" of an established business. Appellant's Brief at 23 (quotations omitted; omission original). Reinhart's suggestion is based on the following language from *Manns*:

> The first factor [of the four factors used to determine whether a note bears a strong resemblance to a recognized

nonsecurity] is the motivation which would prompt a reasonable buyer and seller to enter into the transaction. With respect to this factor, the *Reves* court stated that an instrument is likely to constitute a security if the seller's purpose is "to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate." *Reves*, 494 U.S. at 66, 110 S.Ct. at 952. However, if the purpose of the transaction is to "facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose," then the note is less likely to constitute a security. *Id.*

666 N.E.2d at 1244–45. That language only applies after Reinhart has identified which of the seven nonsecurities the notes here resemble, which, again, he has not done. Having failed to identify a nonsecurity that the notes might resemble, we do not consider what the motivations of the buyer and seller of the notes may have been. *See id.* at 1243 ("This presumption may be rebutted only by showing that the note bears a 'strong resemblance' to one of

---

9. Similarly, Reinhart suggests that the trial court committed reversible error when it did not independently "undergo the entire *Reves* analysis." Appellant's Brief at 23. The trial court expressly relied on this court's analysis in *Manns* when it concluded that the notes were securities, stating, in effect, that if the agreement in *Manns* was a security then the notes here must be too. The trial court's rationale is clearly articulated in the record and its "fail[ure] to undergo the entire Reves analysis" is not reversible error. *See Madison County Bd. of Comm'rs v. Town of Ingalls*, 905 N.E.2d 1022, 1025 (Ind.Ct.App.2009) (noting that our standard of review on appeal from a summary judgment order is not altered when a trial court enters findings and conclusions), *trans. denied.* Further, it was not the trial

court's burden to "identify ... [to] which of the seven non-securities the Promissory Notes bear a 'strong resemblance,'" nor was it the court's burden to "identify which of the four factors it consider[ed] determinative." *See Dreaded, Inc.*, 904 N.E.2d at 1269–70. To the contrary, it was Reinhart's burden to rebut the established presumption that the notes were securities. *See id.; Manns*, 666 N.E.2d at 1243–44.

10. To be sure, the application of the *Reves* test in *Manns* involved a review and application of the commissioner's findings of fact, which we refused to reconsider in light of our deference on factual determinations. *See Manns*, 666 N.E.2d at 1243–46.

seven enumerated instruments deemed not to be 'securities' within the meaning of the statute."). And even if we were to agree with Reinhart—which we do not[11]—that the parties' motivation for the notes satisfied the first of the four factors, "*Reves* requires a *strong* family resemblance to rebut the presumption, [and] that one factor alone does not provide sufficient basis to pull the [notes] outside the scope of the [Act]." *Id.* at 1244. Reinhart does not suggest that any of the other four factors of the *Reves* test are met here. Hence, his attempt to rebut the presumption of the Act must fail.

Finally, Reinhart asserts that the notes were not securities but "merely documentation of a loan." Appellant's Brief at 6–7. Specifically, Reinhart, citing the plain language of the two notes, contends that they "do[ ] not confer any ownership interest in TRG, nor do[ ] [they] indicate that repayment of Boeck's loan is in anyway [sic] tied to the profitability of TRG or the success of its real estate deals." *Id.* at 15. Rather, Reinhart continues, the plain language of each of the two notes shows "a simple loan." *Id.* at 15–16. Again, the first note states that Boeck extended a credit of $150,000 to TRG, to be repaid without interest within sixty days. The second note states that he extended a credit of $86,400, to be repaid without interest within thirty days.

As an initial matter, Reinhart contends that the notes are actually loans and, therefore, are contracts. But the notes are not contracts; they are simply evidence of indebtedness. A contract, such as the usual loan, is "[a]n agreement between two or more parties creating obligations that are enforceable or otherwise recognizable at law." Black's Law Dictio-

nary 318 (7th ed.1999). As Reinhart recognizes, the four corners of the notes reveal no consideration, a requirement for a valid contract. *Jackson v. Luellen Farms, Inc.,* 877 N.E.2d 848, 857 (Ind.Ct.App. 2007). Consideration is "something of value (such as an act, a forbearance, or a return promise) received by a promisor from a promise." *Id.* (citing Black's Law Dictionary 300 (7th ed.1999)). "To constitute consideration, there must be a benefit accruing to the promisor or a detriment to the promisee." *Id.* (quotation omitted). Further, as Reinhart also recognizes, the February 23 note misidentifies the promisor and promisee. Hence, the notes are not in themselves enforceable contracts or negotiable instruments. *See Manns,* 666 N.E.2d at 1243 n. 4. But they are evidence of indebtedness, and that evidence is supplemented by Boeck's unrefuted testimony that he wire transferred $125,000 and $72,000 on February 16 and 23, 2006, respectively, into TRG's checking account. Thus, the notes evidence both TRG's indebtedness to Boeck and Boeck's anticipated profit of at least $39,000.

In any event, Reinhart's argument does not cogently demonstrate how, if the notes were somehow evidence of loans but not indebtedness, that fact rebuts the presumption that the notes are securities. "Loans" generally are not one of the seven nonsecurities identified in *Reves. See id.* at 1243 (citing *Reves,* 494 U.S. at 66, 110 S.Ct. 945). To be sure, "loans by commercial banks for current operations" is a recognized nonsecurity, but TRG was not operating as a commercial bank. *See id.* Again, it was Reinhart's burden to rebut the presumption that the notes are securities. *See Dreaded, Inc.,* 904 N.E.2d at 1269–70. He has failed to do so.

**11.** In support of his suggestions, Reinhart relies on Thomas' false representations to Boeck, even though Reinhart admitted in his deposition that he knew that those statements were false. *See* Appellant's Brief at 23–24; Appellant's App. at 582.

### Whether a Sale Occurred

Reinhart next contends that no sale occurred under the Act. At the time of the transactions, the Act defined a "sale" as "a contract of sale of, contract to sell, or disposition of, a security, or interest in a security for value." I.C. § 23–2–1–1(i)(1) (2005) (effective through June 30, 2008). Specifically, Reinhart argues that the notes "[were] not disposed of because of Boeck's payment, [they were] *created* because of Boeck's payment." Appellant's Brief at 21.

Reinhart's argument on this point is hardly clear. Insofar as he suggests that no sale occurred because the notes were loans and not securities, that argument is addressed above. Again, it is undisputed that Boeck extended credit to TRG, for which he received the February 16 and February 23 notes evidencing TRG's promise to repay his initial investment along with at least $39,000 profit. Thus, there is no genuine issue of material fact that a sale occurred under the Act.[12]

### Reinhart as Thomas' Partner

██ Last, Reinhart contends that the trial court erred in entering summary judgment for Boeck because Boeck's dealings were with TRG, a duly registered corporation under Indiana law, and not Reinhart or a partnership. In entering summary judgment for Boeck, the trial court relied on Boeck's theory that Reinhart was liable to Boeck under a partnership by estoppel. The theory of partnership by estoppel has been recognized in our common law since 1859 and was codified by our General Assembly in 1949. *See* Ind.Code Ann. § 50–416 (Burns Supp. 1949) (currently codified at I.C. § 23–4–1–16); *Booe v. Caldwell,* 12 Ind. 12, 15–17

(1859). Under the current Indiana Code, a partnership by estoppel exists:

> [w]hen a person, by words spoken or written or by conduct, represents himself, or consents to another representing him . . ., as a partner in an existing partnership or with one (1) or more persons not actual partners, he is liable to any such person to whom such representation has been made, who has, on the faith of such representation, given credit to the actual or apparent partnership, and if he has made such representation or consented to its being made in a public manner he is liable to such person, whether the representation has or has not been made or communicated to such person so giving credit by or with the knowledge of the apparent partner making the representation or consenting to its being made.

I.C. § 23–4–1–16(1). That is, a person cannot deny the existence of a partnership when that person holds himself out to be in a partnership with another, although no partnership in fact exists, and a third party detrimentally relies on that representation. *See id; Monon Corp. v. Townsend, Yosha, Cline & Price,* 678 N.E.2d 807, 812 (Ind.Ct.App.1997) (quoting *Wilkerson v. Wood,* 81 Ind.App. 248, 254–55, 143 N.E. 166, 168 (1924)), *trans. denied.*

Here, Boeck's designated evidence in support of his motion for summary judgment consisted of summaries and quotations from Reinhart's deposition, the accuracy of which Reinhart did not challenge in the trial court and does not challenge on appeal. In that testimony, Reinhart conceded that he represented himself as Thomas' partner and consented to Thomas

---

**12.** We also note that, even if Boeck had loaned the money to TRG as Reinhart repeatedly asserts, the issuance of a security in consideration for a loan is a sale under the

Uniform Securities Act, on which Indiana's Act is modeled. *See* 69A Am.Jur.2d Securities Regulation–State § 45 (2009).

representing them as partners in an existing partnership. Reinhart conceded that those representations were made to Boeck, and it is undisputed that Boeck, relying on those representations, extended credit of $197,000 to the apparent partnership. Accordingly, Boeck has demonstrated a prima facie claim for summary judgment on this issue, and the burden shifts to Reinhart to establish a genuine issue of material fact. *See Dreaded, Inc.*, 904 N.E.2d at 1269–70.

In response, Reinhart raises five challenges to the conclusion that he was engaged in a partnership by estoppel with Thomas. First, Reinhart contends that the summary judgment for Boeck is inappropriate because Boeck was harmed by TRG, a corporation, and the trial court did not undergo an analysis to determine if TRG's corporate veil should be pierced. Second, but relatedly, Reinhart contends that Boeck extended credit to a corporation, not a partnership, and therefore a partnership by estoppel cannot be found. Third, Reinhart argues that the trial court erred because its determination of the existence of a partnership relied exclusively on two private communications, which cannot constitute representations to third parties. Fourth, Reinhart suggests that only "managing partners" are liable under the Act. Appellant's Brief at 14, 24. And, finally, Reinhart argues that Boeck cannot resort to a principle of equity for relief because Boeck was aware of Reinhart's fraud. We address each of those five arguments in turn.

■ Reinhart first contends that the trial court erred when it ignored TRG's corporate identity and found him personally liable to Boeck. "Under Indiana law, a corporation is a legal entity separate from its shareholders, and corporate shareholders ... are not personally liable for acts attributable to the corporation." *McQuade v. Draw Tite, Inc.*, 659 N.E.2d 1016, 1020 (Ind.1995) (citations omitted). It is not disputed in this appeal that TRG is a corporation under Indiana law.[13]

■ Of course, corporate entities do not commit fraud, but corporate officers, agents, and employees do. Hence, while Indiana courts are generally reluctant to disregard the corporate identity, we will do so "to protect third parties from fraud or injustice when transacting business with a corporate entity." *Four Seasons Mfg., Inc. v. 1001 Coliseum, LLC*, 870 N.E.2d 494, 504 (Ind.Ct.App.2007). That is, where the corporate existence is merely a sham to perpetuate fraud, Indiana courts have the equitable power to "pierce the corporate veil" and hold the proprietors of the supposed corporation personally liable for their acts. *See, e.g., Cmty. Care Ctrs., Inc. v. Hamilton*, 774 N.E.2d 559, 564–65 (Ind. Ct.App.2002), *trans. denied.*

But Boeck's designated evidence showed that Reinhart falsely held himself out to be in a partnership with Thomas, and Boeck detrimentally relied on that representation. Thus, to succeed with this argument, Reinhart would have to persuade this

---

**13.** It is not clear whether Reinhart had a corporate shareholder's interest in TRG. On January 25, 2006, Reinhart signed a "Shareholder's Interest Purchase Agreement," in which Reinhart was to pay to Thomas $150,000, payable in installments, in exchange for a 45% interest in TRG. Appellant's App. at 325. But that document refers to Reinhart and Thomas as "partner[s]" and states that, "in the event such a decision

should be made to dissolve their partnership, and terminate this Agreement, a Partnership Dissolution Agreement shall be drafted and executed by both parties which shall outline the terms for dissolving the Partnership and release one another of any further liability...." *Id.* at 329. It is not disputed that the terms of the Shareholder's Interest Purchase Agreement were never fully executed by Reinhart and Thomas.

court that even though a partnership by estoppel can be demonstrated it nonetheless ought to be ignored in favor of the corporate identity. But this argument is equivalent to an assertion that the absence of an actual partnership constitutes an affirmative defense to a claim of partnership by estoppel, which is untenable. Not surprisingly, Reinhart cites no authority to support it. The argument is waived. *See* Ind. Appellate Rule 46(A)(8)(a).

■ Further, we decline to reach such a holding here. Reinhart's proposed rule would run contrary to the general principle that "a claim of estoppel may properly be considered whenever a party is alleged to have actively participated in the creation of a misperception of fact or mistaken belief of which it then seeks to take unfair advantage." *Weinig v. Weinig,* 674 N.E.2d 991, 996 (Ind.Ct.App.1996) (citation and quotation omitted). Having misrepresented the nature of his business with Thomas, Reinhart is estopped from using the real nature of that business—that TRG was a corporation—as a defense. Reinhart's first argument is without merit.

Second, Reinhart contends that Boeck extended credit to a corporation, not a partnership, and therefore a partnership by estoppel cannot be found. This argument is substantively indistinguishable from Reinhart's first argument. That is, Boeck has alleged and demonstrated that Reinhart and Thomas represented to him that they were in a partnership, TRG, and that Boeck detrimentally relied on that representation. While a partnership did not in fact exist, in that TRG was a corporation, Reinhart is estopped from denying the existence of a partnership. As such, this argument is also without merit.

Reinhart's third argument is that a genuine issue of material fact precluded the trial court from determining whether he was engaged in a partnership by estoppel with Thomas. In support of this argument, Reinhart asserts that "the evidence relied upon by the trial court in forming this declaration is limited to two 'private communications' between Reinhart and Thomas[,] . . . the 'pep-talk' note . . . and the 'Shareholder Purchase Agreement'. . . ." Appellant's Brief at 13–14. Reinhart's argument lacks candor.

The trial court's assessment of the record, detailed above, relied almost exclusively on Reinhart's own deposition testimony. In that testimony, Reinhart conceded the following: that he solicited investors for TRG, including being the contact listed for an advertisement in the Indianapolis Star; that he and Thomas were "partners" who split profits equally; that he would tell potential investors in TRG that his "partners did about 100 short sales last year" and that the "partners 'had made in excess of $1 million last year' "; and that he typically told potential investors that " 'I and my partners can provide you with multiple listing numbers for each of the properties and records of purchase prices, expenses and selling prices.' " Appellant's App. at 576–78, 581–85 (citing and quoting Reinhart's Deposition). Reinhart also conceded that he had heard Thomas represent to Boeck that Thomas and Reinhart were "partners," which Reinhart did not dispute. *Id.* at 581–82 (citing Reinhart's Deposition). Finally, Reinhart conceded in his testimony that he knew all of his representations were false. *Id.* 576–78, 581–85 (citing Reinhart's Deposition). It is not disputed that Boeck detrimentally relied on Reinhart's representations. Again, it is Reinhart's own deposition testimony that established the elements of partnership by estoppel. Reinhart's oblique comments that the trial court's conclusions were based only on two pri-

vate communications has no basis in the record.

Fourth, Reinhart argues that only "managing partners" under the Act are derivatively liable for the acts of others. Appellant's Brief at 14, 24. However, Reinhart cites law that is not applicable to this case. Reinhart quotes language from the *current* version of the Act, specifically, Indiana Code Section 23–19–5–9(d) (2008), but in recodifying the Act in 2007 our General Assembly expressly declared that the "predecessor act governs all actions ... pending on June 30, 2008." P.L. 27–2007 § 38(b) (effective July 1, 2008). This action was filed and pending before that date. And, under the prior statute, all "partner[s]" are jointly and severally liable. I.C. § 23–2–1–1(d) (2005) (effective through June 30, 2008); *see also Kirchoff v. Selby*, 703 N.E.2d 644, 651 (Ind.1998) ("The statute does not require a partner ... to materially aid a violation to be liable."). Accordingly, this argument must also fail.

Finally, Reinhart argues that Boeck is not permitted to assert that Reinhart and Thomas are estopped from denying their partnership because Boeck was aware of the fraud. "There can be no basis for an estoppel where the party seeking to raise it knew the truth from the beginning[;] therefore, where a creditor knows of the holding out, but also knows that the parties are not partners, no estoppel in his favor arises." *Breinig v. Sparrow*, 39 Ind. App. 455, 80 N.E. 37, 38 (1907). In support of his assertion that Boeck "knew the truth from the beginning," Reinhart points out that each promissory note signed by Boeck is also signed by "Thomas Real Estate Group, Inc.," by its "President," Thomas. Appellant's App. at 414, 761. As such, Reinhart continues, Boeck was well aware of TRG's corporate identity when he invested his money with it.

That evidence does not establish a genuine issue of material fact on the issue of Reinhart's partnership by estoppel with Thomas. Those two designations came, literally, on the last page of the last interaction with Boeck. That is hardly the "kn[owledge of] the truth from the beginning" required to prevent Boeck from asserting partnership by estoppel. *See Breinig*, 80 N.E. at 38. To the contrary, Reinhart and Thomas represented their partnership to Boeck for over two months before Boeck invested in TRG. The notes were the culmination of Reinhart and Thomas' fraud; they did not precede the fraudulent representations. Reinhart's fifth and final argument, like his others, does not withstand scrutiny.

Thus, there is no genuine issue of material fact as to whether Reinhart is estopped from denying the existence of a partnership with Thomas. Contrary to Reinhart's argument on appeal, the trial court relied on substantially more than two private communications between Reinhart and Thomas. The trial court's assessment was based almost entirely on Reinhart's own admissions during his deposition. Those admissions thoroughly demonstrate that Reinhart held himself out to the world, and to Boeck in particular, that he was in a partnership with Thomas, even though that partnership did not in fact exist and Reinhart knew as much. And, again, Boeck detrimentally relied on those representations. Accordingly, Reinhart is estopped from using TRG's corporate identity as a shield from personal liability, and the trial court properly concluded that the undisputed designated evidence showed that Reinhart was Thomas' partner for purposes of the Act.

### Conclusion

In sum, we hold that the undisputed designated evidence demonstrates that there is no genuine issue of material fact

to preclude summary judgment for Boeck on his claim that Reinhart is jointly and severally liable under the Act for Thomas' unlawful sale of securities. Boeck met his burden of showing a prima facie claim of success on each element under the Act, and Reinhart, in response, wholly failed to show the existence of any genuine issues of material fact. Boeck has demonstrated that the notes were unregistered securities, that Thomas sold him those securities, and that Reinhart was Thomas' partner under the Act. Therefore, Boeck was entitled to summary judgment on his claim against Reinhart for joint and several liability for Thomas' acts, and we affirm the trial court's judgment.

Affirmed.

KIRSCH, J., and BARNES, J., concur.